William Skinner SBN 257139
Attorney at Law
3551 Camino Mira Costa Ste D
San Clemente, CA 92672
Tel: (800) 659-5937
Fax: (844) 660-4041
Will@SkinnerEsq.com

Eric J. Menhart (*Admitted Pro Hac Vice*)
Lexero Law
316 F St NE, Suite 101
Washington, DC 20002
Office: (855) 453-9376
Fax: (855) 453-9376
Eric.Menhart@Lexero.com

Attorneys for Plaintiff Spy Dialer, Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA—EASTERN DIVISION

| | |
|---|---|
| SPY DIALER, INC.<br>PO Box 890370<br>Temecula, CA 92589<br><br>    Plaintiff<br><br>v.<br><br>REYA LLC<br>1621 Central Avenue<br>Cheyenne, WY 82001<br><br>and<br><br>JOHN DOES 1-10<br><br>    Defendants | Case No. 5:18-cv-01178-FMO-SHK<br><br>**FIRST AMENDED COMPLAINT WITH JURY TRIAL DEMAND** |

1

COMES NOW, Plaintiff SPY DIALER, INC. ("Spy Dialer"), by and through undersigned counsel, alleging causes of action against Defendants REYA LLC ("Reya") and JOHN DOES 1-10 ("John Does"), (collectively, "Defendants"), in response to Defendants' use of an infringing domain name and Defendants' placement of malicious code, a practice known as "malvertising," on Plaintiff's own website. In support of its allegations, Plaintiff states as follows:

### THE PARTIES

1.     Plaintiff Spy Dialer is a corporation organized and existing under the laws of California, having filed its Articles of Incorporation with the Secretary of State on June 13, 2011.[1]

2.     Plaintiff's Articles of Incorporation identify Robert Scott ("CEO Scott") as Plaintiff's initial agent for service of process and Plaintiff's initial director, with a mailing address in Temecula, California.

3.     CEO Scott is the CEO and founder of Plaintiff Spy Dialer.

4.     Plaintiff Spy Dialer has ownership or control over the domain name spydialer.com and the popular website associated therewith, whereby individuals are able to perform free "reverse" searches to determine the identities or locations of owners of various telephone numbers.

5.     Defendant Reya is a limited liability company organized and existing under the laws of Wyoming, having filed its Articles of Organization with the Secretary of State on September 11, 2014. *See* Exhibit # 1, Defendant Reya's Articles of Organization.

---

[1]   *See* Plaintiff Spy Dialer's Articles of Incorporation (last accessed Feb. 12, 2018) https://businesssearch.sos.ca.gov/Document/RetrievePDF.

6.      Defendant's Articles of Organization identify WyomingRegisteredAgent.com, Inc. ("WRA") as its registered agent, with a mailing address of 1621 Central Avenue, Cheyenne, Wyoming 82001.

7.      Defendant Reya's Articles of Organization mention both "members" and "managers" of the limited liability company, but do not identify any entity or individual categorized as the same.

8.      However, Jeff Smith ("Mr. Smith") has identified himself as the manager of Defendant.[2]

9.      Mr. Smith is believed to be the individual behind the e-mail address jeff@whoeasy.com, who described himself as "the founder and general manager" of Defendant Reya to CEO Scott, although he also identified himself to CEO Scott under the apparent pseudonym of "Jeff Green."[3] See Exhibit # 2, Email from Jeff@whoeasy.com to Info@spydialer.com (Feb. 28, 2017).

10.      Nonetheless, Defendant Reya's Annual Reports of 2015, 2016, and 2017, filed with the Wyoming Secretary of State, do not identify any entity or individual beyond WRA.

11.      Defendant's Annual Report of 2015 is signed by Lisa Espinoza ("Ms. Lisa"), and its Annual Reports of 2016 and 2017 are signed by Angelica Espinoza ("Ms. Angelica").

12.      WRA's website identifies Ms. Lisa and Ms. Angelica as "Support Specialists" who "are the backbone of the company."[4]

---

[2] *See* Spy Dialer, Inc. v. Reya LLC et. al., No. 17-cv-01345, U.S. District Court for the Eastern District of California, ECF # 13-4, *Declaration of Jeff Smith, Manager of Reya LLC* at ¶ 2.

[3] Plaintiff does not presume to know which name, if either, is the true identity of the individual responsible for Defendants' unlawful conduct.

[4] *See* About WyomingRegisteredAgent.com, Inc., https://1621centralavecheyennewy82001.com/about/ (last accessed Feb. 9, 2018).

13.     In an April 5, 2016, article for the McClatchy Washington Bureau, Ms. Angelica remarked on individuals' abilities to conceal their identities as the owners of companies organized under the laws of Wyoming.[5]

14.     Defendant Reya does business as WhoEasy. See Exhibit # 3, whoeasy.com Terms of Use (Sept. 26, 2016).

15.     Defendant Reya owns or controls the website whoeasy.com and the content found therein.

16.     Defendant Reya's whoeasy.com website is a competitor of Plaintiff Spy Dialer's spydialer.com website, but the former charges for a service the latter performs at no cost.

17.     Spydialer.org is a domain name and website that also identifies Defendant Reya as the entity with ownership and control over itself. See Exhibit # 4, www.spydialer.org Terms of Usage.

18.     Defendants John Does are those individuals that own, direct, control, manage, or oversee Defendant Reya and Defendant Spydialer.org and whose true identities are currently unknown to Plaintiff but will be revealed through discovery.

19.     Defendant John Does are also individuals that own, direct, control, manage, or oversee the other false and misleading conduct alleged herein, including the false advertising,

20.     On information and belief, the identity of most of the John Does may be ascertained by way of third parties with whom the John Does have engaged in business transactions.

---

[5] *See* Kevin G. Hall and Marisa Taylor, *US scolds others about offshores, but looks other way at home* (Apr. 5, 2016) http://www.mcclatchydc.com/news/nation-world/national/article70008302.html.

4

21.     On information and belief, Google, Inc. has knowledge of the identities of the John Does, and related transactions, based on certain communications made by Google employees.

22.     On information and belief, certain third parties, such as Truthfinder, Inc., The Control Group Media Company, Inc., and Instant Checkmate, Inc. have knowledge of the identities of the John Does, based on certain communications made by those companies' employees.

23.     On information and belief, there are numerous other John Does that are involved in the actions complained of herein, and there are third parties, both known and unknown to Plaintiff, that would have information sufficient to identify these parties.

## JURISDICTION & VENUE

24.     This Court has original subject-matter jurisdiction over Plaintiff's federal causes of action pursuant to 28 U.S.C. § 1331.

25.     This Court has supplemental jurisdiction over Plaintiff's state causes of action, pursuant to 28 U.S.C. § 1367.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 28 U.S.C. § 1400 because a substantial part of the events giving rise to these claims occurred within this District.

### Reya's Consent to Jurisdiction; Purposeful Availment

27.     On March 22, 2018, Defendant Reya affirmatively filed a lawsuit in Superior Court of the State of California for the County of Riverside. See Exhibit #7.

28.    The lawsuit sought affirmative and declaratory relief that Reya was not liable to Spy Dialer for trademark infringement or other claims related to the advertisements complained of herein. *Id.*

29.    The Ninth Circuit has recognized an "affirmative relief rule, specifying that personal jurisdiction exists where a defendant also independently seeks affirmative relief in a separate action before the same court concerning the same transaction or occurrence."[6]

30.    The Ninth Circuit has expressly explained that "there is nothing unfair, or violative of due process, about requiring a party that has affirmatively sought the aid of our courts with regard to a particular transaction to submit to jurisdiction in the same forum as a defendant with regard to the same transaction with the same party."[7]

31.    Here, the Defendant in this action, Reya, LLC, affirmatively filed suit in a California State Court, in Riverside, concerning the same transactions and occurrences that are the subject of the instant Complaint.

32.    Reya has purposefully availed itself of jurisdiction in California, and in this specific venue.

33.    Personal Jurisdiction over Reya LLC is proper in this Court.

<u>Reya is Subject to Jurisdiction Under California's Long-Arm Statute</u>

34.    California's long-arm statute authorizes personal jurisdiction to the extent permitted by the Due Process Clause of the Constitution.  Cal. Code Civ. Proc. § 410.10.

---

[6] *Dow Chem. Co. v. Calderon*, 422 F.3d 827, 834 (9th Cir. 2005) (*citing* Contracting & Trading Co. v. Interpole, Inc., 940 F.2d 20 (1st Cir. 1991); *Int'l Transactions v. Embotelladora Agral Regiomontana S.A. De C.V.*, 277 F. Supp. 2d 654, 657 (N.D. Tex. 2002)).

[7] *Id.* at 835.

35.    Therefore, the only question the court must ask is whether the exercise of jurisdiction would be consistent with due process.[8]

36.    In a case involving an intentional tort, "specific jurisdiction" arises when (a) the intentional act was expressly aimed at the forum state, causing harm that the defendants knew was likely to be suffered in the forum state and (b) the claim arose out of or was related to the defendant's forum-related activities.[9]

37.    This Court has specific personal jurisdiction over Defendant Reya because Reya's use of malicious code to siphon away Plaintiff's customers, knowing that Plaintiff was a California resident, gave rise to Plaintiff's claims against Reya.

38.    This Court also has specific personal jurisdiction over Defendant Reya because Reya's use of malicious code to siphon away Plaintiff's customers living and residing within the State of California gave rise to Plaintiff's claims against Reya.

39.    This Court has general personal jurisdiction over Defendant Reya because Reya has such continuous and systematic contacts with the State of California, so as to render Reya essentially at home here.

40.    Defendant Reya advertises to, solicits from, and targets customers living and residing within the State of California by way of its search services for California-specific telephone area code online records through the whoeasy.com website and domain name.

---

[8] *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003); *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1317 n.2 (9th Cir. 1998).
[9] *Dole Food Co. v. Watts*, 303 F.3d 1104, 1110–11 (9th Cir. 2002)

41.     Defendant Reya profits by taking information derived from California-specific telephone area code online records and providing said information in search results.

42.     On whoeasy.com, Defendant Reya advertises that "WhoEasy offers an easy and simple way to trace any phone number by simply entering it into our search bar and clicking search." See Exhibit # 6, whoeasy.com Summary of U.S. Area Code System & Active U.S. Area Codes.

43.     In support of this advertisement, Defendant Reya provides a list of "Active US Area Codes," and telephone numbers associated therewith are searchable through the whoeasy.com website.

44.     Through whoeasy.com, Defendant Reya affirmatively advertises its ability to perform searches for the identities of owners of numerous California-specific telephone numbers.

45.     Through whoeasy.com, after Defendant Reya identifies the geographic region with which the searched-for telephone area code is associated, Reya then displays an interactive map of said geographic region for the searcher to explore.

46.     Upon displaying the results of a telephone search with a California-specific area code, Defendant Reya solicits the sales of membership subscriptions to whoeasy.com to searchers living and residing in the State of California and searchers seeking California-specific information.

47.     Upon displaying the results of a telephone search with a California-specific area code, Defendant Reya proposes that searchers "Select Your Plan," whereby Reya offers pricing options for its membership subscriptions to whoeasy.com.

48.     By displaying this California-specific information and data to searchers on whoeasy.com, Defendant Reya attempts to, and actually does, profit through these paid membership subscriptions.

49.     On information and belief, Reya has derived millions of dollars in revenue from California residents by way of their information offerings.

50.     Notably, much of Defendant Reya's deceitful and unlawful conduct occurred within this judicial district.

## FACTUAL BACKGROUND

51.     Plaintiff Spy Dialer operates the website found at domain name spydialer.com, supra, which uses publicly-available records and data to supply information about telephone numbers to the public, for free.

52.     The website spydialer.com has been highly-ranked by major search engines, including Google, as a result for search terms such as "free cell phone search."

53.     Plaintiff Spy Dialer's website attracts hundreds of thousands of users per month.

54.     Plaintiff Spy Dialer's website and brand name are well-known on the Internet for providing free "reverse" searches of telephone numbers.

55.     Thus, Plaintiff Spy Dialer's website has significant traffic on a daily basis and is a highly-valued brand in the telephone number-lookup market.

56.     Defendant Reya, through its website at whoeasy.com, offers services similar to those of Plaintiff.

57.     Defendant Reya, through its website at whoeasy.com, competes with Plaintiff for the patronage of telephone number-searchers.

58.     Plaintiff Spy Dialer's website spydialer.com generates revenue through the placement of advertisement banners, whereby third-party advertisers attempt to convert users of Plaintiff's free telephone number-lookup services into customers of their own.

59.     Third-party advertisers purchase advertising space in the form of advertisement banners on spydialer.com.

60.     Plaintiff Spy Dialer allows third-party advertisers to purchase advertising space on spydialer.com through major online advertising services, such as Google Ad Services, Google AdX, Google Adwords, and Adnimation (collectively, the "Advertising Platforms").

61.     The Advertising Platforms serve as intermediaries between third-party advertisers and the publisher-websites of said advertisements.

62.     Popular websites like Plaintiff's spydialer.com website notify potential advertisers of available advertising space on their websites through the Advertising Platforms.

63.     Websites that are seeking to increase their traffic or sales purchase the available advertising space on the popular websites through the Advertising Platforms.

64.     These third-party advertisers supply the Advertising Platforms with the computer code that underlies their proposed advertisements.

65.     These third-party advertisers are responsible for the content of their computer code and must adhere to the Advertising Platforms' Acceptable Use Policies or Terms of Use.

66.     These third-party advertisers have the right and responsibility to produce the computer code that underlies their proposed advertisements and ensure that the code is viable and not contrary to the terms and conditions of the Advertising Platforms.

67.     Popular websites like Plaintiff's spydialer.com typically insert Hypertext Markup Language ("HTML") into their websites to facilitate the publication of the purchased advertisements.

68.     The HTML insertions allow the popular websites to automatically display the third-party advertisements purchased by third-party advertisers through the Advertising Platforms.

<u>Spy Dialer's First Contact with Defendant Reya</u>

69.     In or around February and March 2017, Defendant Reya – through Mr. Smith using the apparent pseudonym Jeff Green, supra – attempted to negotiate an affiliate deal with Plaintiff Spy Dialer by contacting CEO Scott.

70.     Reya knew that Spy Dialer was an industry leader, and that Spy Dialer attracted valuable internet traffic. Reya also knew that the traffic from Spy Dialer would be valuable to their own, competing site.

71.     Although CEO Scott entertained Mr. Smith's overtures, he was ultimately unconvinced by the offers and declined to enter a business relationship with Defendant Reya.

72.     On information and belief, given the failure of the business deal, Reya began to intentionally plan for other opportunities to monetize the traffic of Spy Dialer for Reya's benefit.

<u>Defendants' Advertisement & the Underlying "Malicious" Code</u>

73.   Defendant Reya, owner of competing website whoeasy.com, and/or other John Doe Defendants, purchased advertising space on Plaintiff's spydialer.com website through the Advertising Platforms.

74.   Defendant Reya and/or the John Does purchased banner advertisements on spydialer.com for Reya's competing whoeasy.com website; and John Does purchased banner advertisements on spydialer.com for the website truthfinder.com.

75.   Defendants' purchased advertisements differed from the typical third-party advertisement displayed on Plaintiff's spydialer.com website.

76.   Defendants' purchased advertisements on Plaintiff's spydialer.com website were composed of a sophisticated, underlying computer code that was malicious.[10][11]

77.   Defendants intentionally and fraudulently created a malicious computer code to underlie the advertisements, intentionally and fraudulently submitted this malicious computer code to the Advertising Platforms, and intentionally and

---

[10] "Malicious code is the term used to describe any code in any part of a software system or script that is intended to cause undesired effects, security breaches or damage to a system. Malicious code is an application security threat that cannot be efficiently controlled by conventional antivirus software alone. Malicious code describes a broad category of system security terms that includes attack scripts, viruses, worms, Trojan horses, backdoors and malicious active content." Neil DuPaul, Veracode, *What Is Malicious Code?* (last accessed Feb. 9, 2018) www.veracode.com/security/malicious-code.

[11] "Malicious code is the kind of harmful computer code or web script designed to create system vulnerabilities leading to back doors, security breaches, information and data theft, and other potential damages to files and computing systems. It's a type of threat that may not be blocked by antivirus software on its own. . . . Malware specifically refers to malicious software, but malicious code includes website scripts that can exploit vulnerabilities in order to upload malware. It is an auto-executable application that can activate itself and take on various forms, including Java Applets, ActiveX controls, pushed content, plug-ins, scripting languages or other programming languages that are designed to enhance Web pages and email." Kaspersky Lab, *What is Malicious Code?* (last accessed Feb. 9, 2018) (alteration added) usa.kaspersky.com/resource-center/definitions/malicious-code.

1  fraudulently caused the malicious computer code to be published on Plaintiff's
2  spydialer.com website.

3      78.    Defendants' intentionally and fraudulently created malicious computer
4  code was purposefully designed to siphon off visitors to Plaintiff's spydialer.com
5  website by redirecting them, without their knowledge or consent, to Defendant
6  Reya's whoeasy.com website.

7      79.    Defendants knew that the computer code would interfere with Spy
8  Dialer's website, and Reya knew that it would profit as a result of the interference it
9  created on the Spy Dialer website.

10     80.    The computer code employed by Reya was sophisticated and could
11 only be created by an individual or team of individuals with advanced knowledge of
12 computers, computer code, and the Internet.

13     81.    The computer code could only be created by an individual or team of
14 individuals that knew HTML and other relevant coding language.

15     82.    The false and malicious code could not have been created in error,
16 because most computer coding errors result in errors that preclude the computer
17 application from operating at all.The computer code would have had to be originally
18 created or directed, using human ingenuity.

19     83.    The computer code could only be created by intentional acts,
20 undertaken by humans with a particular end result in mind.

21     84.    For example, a computer programmer would have had to identify the
22 purpose of the computer application.

23     85.    Next, the coder would need to type or insert a variety of alphanumeric
24 characters, in a specific order into a text file or other computer coding platform.

25

86.     There are millions or billions of possible ways to enter alphanumeric code into a text file.

87.     It is a virtual impossibility that a "coding error," would lead to a result such as the one demonstrated by the video in Exhibit #8.

88.     To use Plaintiff Spy Dialer's free services at spydialer.com, users of the Internet must affirmatively seek Plaintiff's website out, either by searching for it with a search engine such as Google or by typing the domain name into their web browser.

89.     Thus, visitors to Plaintiff's spydialer.com website affirmatively choose to patronize it, picking out spydialer.com as their method of choice for searching telephone numbers online.

90.     However, Defendants' advertisements on Plaintiff's spydialer.com website contained the intentionally and fraudulently created malicious code that employed a method of "focus stealing,"[12][13] whereby, upon opening the webpage at spydialer.com, visitors that had chosen Plaintiff's services were automatically scrolled down to Defendants' purchased advertisement on the bottom of the page. See Exhibit # 8, Video of Defendant Reya's Malicious Banner Advertisements at Work on Plaintiff's spydialer.com Website.

---

[12] "In computing, the focus indicates the component of the graphical user interface which is selected to receive input. Text entered at the keyboard or pasted from a clipboard is sent to the component which has the focus. Moving the focus away from a specific user interface element is known as a blur event in relation to this element. Typically, the focus is withdrawn from an element by giving another element the focus. This means that focus and blur events typically both occur virtually simultaneously, but in relation to different user interface elements, one that gets the focus and one that gets blurred." Wikipedia, *Focus (computing)* (last visited Feb. 9, 2018) Wikipedia.*org*/wiki/Focus_(computing).

[13] "In computing, focus stealing is a mode error produced when a program not in focus (e.g. minimized or operating in background) places a window in the foreground and redirects all keyboard input to that window. This is considered to be an annoyance or hazard to some users because the program may steal focus while their attention is not on the computer screen, such as when typing while reading copy to the side." Wikipedia, *Focus stealing* (last visited Feb. 9, 2012) Wikipedia.*org*/wiki/Focus_stealing.

91.   As demonstrated by the video referenced in Exhibit #8, a user on Spy Dialer's website was intentionally redirected to the Reya advertisement.

92.   Defendants' purchased advertisements on spydialer.com were purposefully designed to appear similar to the existingsearch box on Plaintiff's website.

93.   Upon opening Plaintiff's webpage at spydialer.com and being automatically scrolled to Defendants' purchased advertisement, visitors' cursors would automatically appear within the search box in Defendants' purchased advertisement, rather than within Plaintiff's search box at the top of the page.

94.   Upon opening Plaintiff's webpage at spydialer.com, being automatically scrolled down, and finding their cursors within Defendants' purchased advertisement, visitors were prohibited by the advertisement's malicious underlying code from scrolling back up to Plaintiff's search box at the top of the page.

95.   To visitors of spydialer.com, Defendants' purchased advertisement on Plaintiff's website was the first and only search tool they saw.

96.   To visitors of spydialer.com, Defendants' purchased advertisement on Plaintiff's website appeared to be the Spy Dialer form to enter a phone number.

97.   To visitors of spydialer.com, Defendants' purchased advertisement on Plaintiff's website appeared to be the search tool provided by Plaintiff Spy Dialer itself.

98.   Defendants' "focus stealing" was incredibly likely to confuse visitors of spydialer.com into thinking that Reya's purchased advertisement actually was the search tool they had affirmatively sought out at spydialer.com.

99.    This underlying malicious code constituted a "wire, electronic, or oral communication through the use of an electronic, mechanical, or other device."[14]

100.    The code was electronic, having been delivered via numerous computer communications via the Internet.

101.    The code was also delivered via an electronic device, namely, the servers, computers, wires, and other devices on which the Internet is operated.

102.    The code itself was a "device" as contemplated by the statute.

103.    Unwitting visitors of Plaintiff's spydialer.com website would, through no affirmative actions of their own, be forced to enter the telephone number they wished to search into Defendants' purchased advertisement for whoeasy.com, rather than into the visitors' intended and chosen search tool – spydialer.com.

104.    Visitors toPlaintiff's spydialer.com website that did unwittingly enter the telephone number they wished to search into Defendants' intentionally confusing purchased advertisement were then redirected, without their knowledge or assent, to Reya's website at whoeasy.com.

105.    Such unwitting visitors would have no reason to suspect that they had been redirected to Defendants' website, as they reasonably would have expected a new page to appear on Plaintiff's spydialer.com website after they entered the telephone number they wanted to search for either way.

106.    The search inquiries and accompanying information that these unwitting visitors to Plaintiff's spydialer.com website intended to communicate to Plaintiff was instead intercepted by Defendants, without the knowledge of either Plaintiff or the visitor.

---

[14] 18 U.S.C. § 2510(4).

107. Defendants, by duping each of these visitors to Plaintiff's spydialer.com website and redirecting them to whoeasy.com, gained access to each visitor's computing device and the information associated therewith without the visitor's knowledge or consent.

108. Unwitting visitors to Plaintiff's spydialer.com website, hoping to utilize Plaintiff's free services, would instead find themselves at Defendants' competing website, where a fee was required in order to take advantage of a similar, competing service.

109. For these unwitting visitors seeking a free service, Plaintiff's spydialer.com website would be linked with Defendant Reya's whoeasy.com website, or other websites associated with the Defendants.

110. To an unwitting visitor, this linking between Plaintiff Spy Dialer's and Defendants' websites would appear as a classic "bait-and-switch"[15] scheme, whereby the visitor is initially lured in with the promise of a free service, but after the visitor has put forth the time and energy of entering a telephone number that he or she desires to search, he or she is surprised with a demand for payment.

111. This association harmed Plaintiff Spy Dialer's brand and reputation in the marketplace, as well as the reputation of its website, spydialer.com.

---

[15] *See* Article, David Adam Friedman, *Explaining "Bait-and-Switch" Regulation*, 4 Wm. & Mary Bus. L. Rev. 575, 579 (April 2013) (alteration added) (footnotes omitted) ("Bait and switch is frequently used to describe a range of commercial behaviors, only some of which meet the legal criteria for deception under section 5 of the Federal Trade Commission Act (FTC Act). . . . I expand the scope of the term "bait and switch" beyond the legal definition to include scenarios where consumers are lured in with a low-price introductory offer and are later locked in to paying a potentially higher price for the same offer. Some of these tactics are omnipresent and lawful, but others have been designated unlawful by the Federal Trade Commission (FTC), by federal statute, by state regulation, and are also held in disfavor by common law doctrines.").

112.   Defendants' malicious advertisement on Plaintiff's spydialer.com website further harmed Plaintiff Spy Dialer by funneling "page views" and the corresponding profits from advertisers away from spydialer.com and toward whoeasy.com.

113.   Defendants' traffic at whoeasy.com and other websites no doubt increased significantly as a result of its hijacking of Plaintiff Spy Dialer's customers.

114.   Defendants no doubt profited from diverting Plaintiff Spy Dialer's customers to itself, converting some of these dissatisfied consumers into paying members of Defendant Reya's subscription services.

115.   Defendants' insertion of malicious code, a practice known as "malvertising," into its advertisements, prior to passing the advertisements through the Advertising Platforms and onto Plaintiff's spydialer.com website, was knowing, intentional, and fraudulent.

<u>Spy Dialer's Discovery of Defendants' Unlawful Acts</u>

116.   Defendants' purchased advertisement and its underlying malicious code, intentionally created by Reya in order to defraud consumers, appeared on Plaintiff Spy Dialer's spydialer.com website for multiple months, stealing Spy Dialer's customers and profits and actively damaging its reputation.

117.   From on or about May 3, 2017, through on or about August 25, 2017, Defendants' purchased advertisement appeared on spydialer.com approximately ten million times, and the malicious computer code routinely appeared to Spy Dialer consumers

118.   After Defendants' fraudulent and malicious banner advertisements had appeared on Plaintiff's spydialer.com website for multiple months, Plaintiff Spy

Dialer discovered their existence while undertaking a routine performance analysis of its website.

119.   On August 23, 2017, CEO Scott observed that Plaintiff's spydialer.com website was saturated with banner advertisements for Defendant Reya's whoeasy.com website, or other websites maintained by the John Does.

120.   These banner advertisements resulted in Plaintiff's spydialer.com website being extraordinarily difficult, if not entirely impossible, to use as Plaintiff Spy Dialer had intended.

121.   Visitors to Plaintiff's spydialer.com website had their focus hijacked by Defendants' malicious banner advertisements, wherein the visitors' cursors and computer screens were directed to the whoeasy.com banner advertisement to input the telephone number they wanted to search, and although the banner advertisement appeared to be part of spydialer.com, visitors were unwittingly redirected to Defendants' websites.

122.   CEO Scott, on behalf of Plaintiff Spy Dialer, immediately reached out to Mr. Smith through the e-mail address jeff@whoeasy.com. See Exhibit # 9, Email Exchange Between Info@spydialer.com and Jeff@whoeasy.com (Aug. 24, 2017 – Aug. 26, 2017).

123.   Mr. Smith admitted that he and Defendant Reya were fully or partially responsible for the creation of the malicious code and its ultimate placement on Plaintiff Spy Dialer's website. See Exhibit #9.

124.   Mr. Smith contended that the malicious code and its effects of "stealing focus," hijacking the cursors of Plaintiff Spy Dialer's customers, and redirecting said customers to whoeasy.com, were the result of a "coding error."

125.    This admission, alone, constitutes factual basis for a negligence claim, as set out below.

126.    However, Plaintiff has been informed – and common sense advises – that the sophisticated creation of the malicious code, targeted placement of the malicious code, functional features of the malicious code, and the malicious code's incredibly positive business results for Defendants, can only come about through intentional conduct.

127.    Indeed, Defendant Reya already admits that, at a minimum, there were coding "errors," supporting, at a minimum, a negligence claim.

*Spy Dialer Files Complaint with Google Ad Services over Whoeasy Banners*

128.    Plaintiff is informed that Google Ad Services require advertisers using their services like Adwords to agree to their acceptable use or Terms of Service prior to placing ads through their platforms.

129.    Plaintiff is informed and believes that Reya used Google Adwords to place its banners on spydialer.com.

130.    The Google Adwords program Terms can be found online at https://www.google.com/intl/en_us/adwords/select/TCUSbilling.html.

131.    The Google Adwords Terms state in paragraph 3, Prohibited Uses, "You shall not, and shall not authorize any party to: (a) generate automated, fraudulent or otherwise invalid impressions or clicks; or (b) advertise anything illegal or engage in any illegal or fraudulent business practice in any state or country where your ad is displayed."

132.   Plaintiff alleges that Defendants violated both part "a" of Google Adwords Terms in that its intentionally deceitful web banners did generate fraudulent clicks and;

133.   Plaintiff alleges that Defendants violated part "b" of Google Adwords Terms in that tricking visitors who intended to come to and use the free services at spydialer.com into going to whoeasy.com constituted a "fraudulent business practice."

134.   On or about August 28, 2017, Plaintiff filed a complaint with Google Adsense, the publisher side of Google Ad Services, including details about the whoeasy banner ads that were run on its site.

135.   On September 11, 2017, Google Adservices emailed Plaintiff that they had completed their investigation of the whoeasy banners and had "disapproved all 34 creatives of whoeasy.com." Plaintiff is informed that "creatives" is an Internet industry term meaning "advertisements." *See* Exhibit # 9.

136.   Plaintiff is informed that "disapproved" means banned from further use.

137.   Google "disapproved" of the ads because the advertisements constituted a fraudulent business practice.

<u>Spy Dialer's Loss</u>

138.   Plaintiff Spy Dialer incurred substantial financial losses as a direct result of the approximately ten million offending advertisements placed by Defendants on Plaintiff's spydialer.com website.

139.   Plaintiff Spy Dialer's resultant losses are not entirely known at this time, and could possibly continue through the present day.

Spy Dialer's Affiliate Advertising Losses

Over the Course of Defendant Reya's Malicious Banner Advertisements

140.   Plaintiff Spy Dialer had a lucrative and mutually-beneficial relationship with the entity Truthfinder.com that was undercut and lost as a result of Defendants' malicious banner advertisements.

141.   Plaintiff's spydialer.com website published advertisements for Truthfinder.com's subscription services, and when a user of Plaintiff's free services subscribed to Truthfinder.com, Plaintiff Spy Dialer received an advertising affiliate payment.

142.   In the last month before Defendant Reya placed its malicious banner advertisements on Plaintiff's spydialer.com website, that month being April 2017, the affiliate advertising agreement with Truthfinder.com generated $26,010 of income for Plaintiff Spy Dialer.

143.   Without knowing why, Plaintiff Spy Dialer saw those revenues drop, month after month once Defendants began to publish its intentionally fraudulent malicious banner advertisements on spydialer.com and steal Plaintiff's customers.

144.   In May 2017, the affiliate advertising agreement with Truthfinder.com generated $24,262 of income for Plaintiff Spy Dialer, down $1,748 from the month prior.

145.   In June 2017, the affiliate advertising agreement with Truthfinder.com generated $20,108 of income for Plaintiff Spy Dialer, down $4,154 from the month prior, and down $5,902 overall.

146.   In July 2017, the affiliate advertising agreement with Truthfinder.com generated $18,018 of income for Plaintiff Spy Dialer, down $2,090 from the month prior, and down $7,992 overall.

147.   From August 1, 2017, through August 18, 2017, the affiliate advertising agreement with Truthfinder.com generated $9,790 of income for Plaintiff Spy Dialer, down $8,228 from the month prior, and down $16,220 overall.

148.   If the income generated by the affiliate advertising agreement with Truthfinder.com had held constant through the end of August 2017, the agreement would have generated approximately $16,860 of income for Plaintiff Spy Dialer,[16] down $1,158 from the month prior, and down $9,150 overall.

149.   Unable to continue to sustain such heavy losses in revenue and unable to ascertain a contravening cause for the steep decline, Plaintiff Spy Dialer was forced to end its business relationship with Truthfinder.com on August 18, 2017, prior to the discovery of Defendant Reya's intentional and fraudulent malicious banner advertisements.

150.   Plaintiff Spy Dialer entered into a new affiliate advertising agreement with PeopleFinders.com for the remainder of August 2017, which generated an additional $5,744 of income for Plaintiff for the month.

151.   Plaintiff Spy Dialer's total income for August 2017 was $15,534, down $10,476 overall.

152.   Based on the affiliate advertising agreements with Truthfinder.com and PeopleFinders.com alone, Plaintiff Spy Dialer lost at least $26,118 in income over

---

[16] ($9790/18)*31.

1  the period in which Defendants ran their intentional and fraudulent malicious banner

2  advertisements on spydialer.com.

3  153.  Moreover, Plaintiff Spy Dialer lost a valued and valuable business

4  relationship as a result of Defendants malicious banner advertisements.

5  <u>Damage to Spy Dialer's Google Ranking</u>

6  154.  Plaintiff Spy Dialer sustained additional damage as a result of

7  Defendants intentional and fraudulent malicious banner advertisements.

8  155.  Plaintiff Spy Dialer's ranking in Google's search engine results fell

9  significantly as a result of Defendant Reya's intentional and fraudulent malicious

10  banner advertisements.

11  156.  This fall in the rankings equates with significantly fewer page views

12  and lower monetization of Plaintiff's spydialer.com website.

13  157.  Plaintiff Spy Dialer's ranking in Google's search engine results have

14  yet to recover from the damage wrought by Defendants' malicious banner

15  advertisements.

16  158.  These financial losses continue to toll.

17  159.  Plaintiff's website would not have had its search engine ranking

18  penalized without the false and misleading advertisements, intentionally supplied by

19  Reya, running on the Spy Dialer website.

20  160.  Defendants' intentional and fraudulent malicious banner

21  advertisements that were published on Plaintiff's spydialer.com website created an

22  extremely poor user-experience for visitors to the site.

23  161.  Historically, visitors to Plaintiff's spydialer.com website are primarily

24  interested in obtaining free information about a telephone number they happen

25

1 across, such as when they miss a telephone call from a number that is not found

2 within their contacts list.

3 162. While Defendants' intentional and fraudulent malicious banner

4 advertisements were being published on Plaintiff's spydialer.com website, visitors

5 to the site were not provided with the free and simple service that they desired and

6 expected, but rather, were redirected to Defendant Reya's whoeasy.com website,

7 where Reya attempted to shill the *exact* same service, but at a cost.

8 163. Visitors to Plaintiff's spydialer.com website were no doubt

9 disappointed by this "bait and switch," supra, and certainly experienced a negative

10 consumer experience when their free search needs were left unmet by Defendant

11 Reya.

12 164. Plaintiff Spy Dialer is aware that Google's search engine rankings are

13 informed by whether or not a website meets the needs of the web users that visit it.[17]

14 165. Plaintiff Spy Dialer is aware that Google utilizes human evaluators to

15 review its search engine results and rate the quality of the websites shown, grading

16 websites for overall user experience, "page quality," and whether or not the user's

17 needs are met.[18]

18 166. Plaintiff Spy Dialer is aware that Google's official guidelines instruct

19 the human evaluators to assign low marks to those websites that utilize "disruptive

20 ads."[19]

21

22

23 [17] *See* Google Inc., *Google Search Quality Rating Guidelines* at p.5 (published July 27, 2017) https://static.googleusercontent.com/media/www.google.com/en//insidesearch/howsearchworks/assets/searchqualityevaluatorguidelines.pdf; *see also* Google Inc., *Google Webmaster Guidelines* (last accessed Feb. 9, 2018) https://support.google.com/webmasters/answer/35769.

24 [18] *Id.*

25 [19] *See* Google Inc., *Google Search Quality Rating Guidelines*, *supra*, at p.31.

167.   In educating its human evaluators, Google notes that "[s]ome **Low** quality pages have adequate [Main Content] present, but it is difficult to use the [Main Content] due to disruptive, highly distracting, or misleading Ads/[Supplementary Content]. Misleading titles can result in a very poor user experience when users click a link only to find that the page does not match their expectations."[20]

168.   Google further advises that, "[i]f users are misled into clicking on Ads or [Supplementary Content], or if clicks on Ads or [Supplementary Content] leave users feeling surprised, tricked or confused, a **Low** rating is justified."[21]

169.   During the time period that Defendants' malicious banner advertisements were being published on Plaintiff's spydialer.com website, the website would have been easily described as containing "disruptive ads," which justify a **Low** rating from Google's human evaluators, supra.

170.   Google also instructs the objective human evaluators of websites with regards to "deceptive page design", noting that "[s]ome pages are deliberately designed to manipulate users to take an action that will benefit the owner of the website rather than help the user."[22]

171.   Google advises that such websites should receive "the **Lowest** rating . . ."[23]

172.   Google goes on to describe three "common types of deceptive pages."[24]

---

[20] *Id.* (emphasis in original) (alterations added).
[21] *Id.* (emphasis in original) (alterations added).
[22] *Id.* at p.38 (alteration added).
[23] *Id.* (emphasis in original) (alteration added).
[24] *Id.* at pp.38-39.

173.   First, Google addresses "[**p**]**ages that disguise Ads as** [**Main Content**]," describing such pages thusly: "Actual [Main Content] may be minimal or created to encourage users to click on the Ads. For example, **fake search pages** [] that have a list of links that look like a page of search results. If you click on a few of the links, you will see that the page is just a collection of Ads disguised as search engine results. A 'search box' is present, but submitting a new query just gives you a different page of Ads disguised as search results."[25]

174.   Second, Google addresses "[**p**]**ages that disguise Ads** as website navigation links," illustrating such pages as follows: "For example, **fake directory pages** [] that look like a personally curated set of helpful links, possibly with unique descriptions. In reality, the links are Ads or links to other similar pages on the site. Sometimes the descriptions of the links are unrelated to the page."[26]

175.   Finally, Google describes "[**p**]**ages where the** [**Main Content**] **is not usable or visible**," explaining them thusly: "For example, a page that has such a large amount of Ads at the top of the page (before the [Main Content]), so that most users will not see the [Main Content], or a page where the [Main Content] is invisible text."[27]

176.   Moreover, Google's official guidelines,[28] state that "An experience is abusive if it meets any of the following conditions . . . It misleads or tricks the user into interacting with it."

---

[25] *Id.* at p.38 (emphases in original) (alterations added).
[26] *Id.* at pp.38-39 (emphases in original) (alterations added).
[27] *Id.* at p.39 (emphases in original) (alterations added).
[28] https://support.google.com/webtools/answer/7347327

177.   Plaintiff Spy Dialer is aware that these human evaluators' ratings and reviews impact Google's rankings of search engine results, such that low marks result in a lower ranking in Google's list of results for a given search.

178.   On information and belief, the human evaluators disallowed the advertisements, based on the stated Google policy against misleading conduct, including "abusive experiences."

179.   During the time period that Defendants' intentional and fraudulent malicious banner advertisements were being published on Plaintiff's spydialer.com website, Plaintiff's website would have been easily categorized as any one of the three types of deceptive page designs, all of which mandate the **Lowest** possible rating by Google's human evaluators, supra.

180.   With this information, it is Plaintiff Spy Dialer's belief that its spydialer.com website was significantly downgraded while Defendants' malicious banner advertisements were being published thereon, leading to significantly fewer referrals from Google's search engine results and, consequently, significantly lower advertising revenues.

<u>Spy Dialer's Continuing Traffic & Affiliate Advertising Losses</u>

<u>After Defendant Reya's Malicious Banner Advertisements</u>

181.   Google Analytics maintains records of "user sessions" on websites that result from Google's listing of the website in its search engine results.[29]

---

[29] *See* SearchMicroservices, Margaret Rouse, *user session (visit)* (last visited Feb. 9, 2018) searchmicroservices.techtarget.com/definition/user-session-visit (emphasis in original) ("In tabulating statistics for Web site usage, a user session (sometimes referred to as a *visit*) is the presence of a user with a specific IP address who has not visited the site recently (typically, anytime within the past 30 minutes). The number of user sessions per day is one measure of how much traffic a Web site has. A user who visits a site at noon and then again at 3:30 pm would count as two user visits."). *See also* Google Inc., *The difference between AdWords Clicks, and Sessions, Users, Entrances, Pageviews, and Unique Pageviews in Analytics* (last visited Feb. 9, 2018) https://support.google.com/analytics/answer/1257084?hl=en (emphasis

182.   Google Analytics also records the number of "pageviews" that websites receive as a result of Google's listing of the website in its search engine results.[30]

183.   According to Google Analytics, in April 2017, the last month before Defendant Reya's malicious banner advertisements began to be published on Plaintiff's spydialer.com website, Google's search engine sent visitors to the website for 645,343 discrete "sessions."

<u>The September 2017 Traffic Loss</u>

184.   According to Google Analytics, in September 2017, the first month after Defendant Reya's malicious banner advertisements were removed from Plaintiff's spydialer.com website, Google's search engine sent visitors to the website for 494,886 discrete "sessions," resulting in an overall loss per month of 150,457 "sessions."

185.   According to Google Analytics, in September 2017, the pageviews per session at Plaintiff's spydialer.com website was 5.93 pages per session, equaling an overall loss per month of 892,210 pageviews.[31]

186.   According to Adnimation, Plaintiff's spydialer.com website earned $5.21 RPM[32] in September 2017.

---

in original) (alteration added) (". . . *Sessions* indicates the number of unique sessions indicated by your users.").

[30] *See* Google Inc., *The difference between AdWords Clicks, and Sessions, Users, Entrances, Pageviews, and Unique Pageviews in Analytics*, *supra* (emphasis in original) ("A *pageview* is defined as a view of a page on your site that is being tracked by the Analytics tracking code. If a user clicks reload after reaching the page, this is counted as an additional pageview. If a user navigates to a different page and then returns to the original page, a second pageview is recorded as well.").

[31] 150,457*5.93

[32] "RPM is the page revenue per thousand impressions and is calculated by dividing your estimated earnings by the number of pageviews you received, then multiplying by 1000." Sovrn Holdings, *RPM vs CPM & Why It Matters For Publishers* (May 22, 2015) https://www.sovrn.com/blog/rpm-vs-cpm-matters-publishers/.

187.   Thus, the value of the lost traffic in September 2017 due to Defendant Reya's malicious banner advertisements on spydialer.com was at least $4,648.[33]

<u>The September 2017 Affiliate Advertising Losses</u>

188.   As a direct result of the lower referrals from Google's search engine to Plaintiff's spydialer.com website in September 2017, attributable to Defendant Reya's intentional and fraudulent malicious banner advertisements, Plaintiff's affiliate advertising revenues also continued to drop.

189.   In September 2017, Plaintiff Spy Dialer's affiliate advertising agreements generated $13,855 of income, down $12,155 overall from the April 2017 baseline of $26,010.

<u>The October 2017 Traffic Loss</u>

190.   As a direct result of the continued damage to Plaintiff Spy Dialer's ranking in Google's search engine results from Defendants' intentional and fraudulent malicious banner advertisements, referrals from Google's search engine to Plaintiff's spydialer.com website continued to drop, even after removal of the malicious banner advertisements.

191.   In October 2017, referrals from Google's search engine results to Plaintiff's spydialer.com website dropped to 433,503 "sessions," a decline of 211,840 "sessions" attributable to Defendants' malicious banner advertisements.

192.   According to Google Analytics, in October 2017, the pageviews per session at Plaintiff's spydialer.com website was 6.04 pages per session, equaling an overall loss for the month of 1,279,513 pageviews.

---

[33] 892,210*5.21

193.   According to Google Adsense, Plaintiff's spydialer.com website earned $5.40 RPM in October 2017.

194.   Thus, the value of the lost traffic in October 2017 due to Defendant Reya's malicious banner advertisements on spydialer.com was at least $6,909.

### The October 2017 Affiliate Advertising Losses

195.   As a direct result of the lower referrals from Google's search engine to Plaintiff's spydialer.com website in October 2017, attributable to Defendant Reya's intentional and fraudulent malicious banner advertisements, Plaintiff's affiliate advertising revenues also continued to remain below April 2017 baseline levels.

196.   In October 2017, Plaintiff Spy Dialer's affiliate advertising agreements generated $16,500 of income, down $9,510 overall.

### The November 2017 Traffic Loss

197.   In November 2017, referrals from Google's search engine results to Plaintiff's spydialer.com website dropped to 396,132 "sessions," a decline of 249,211 "sessions" attributable to Defendants' intentional and fraudulent malicious banner advertisements.

198.   According to Google Analytics, in November 2017, the pageviews per session at Plaintiff's spydialer.com website was 6.04 pages per session, equaling an overall loss for the month of 1,505,234 pageviews.

199.   According to Google Adsense, Plaintiff's spydialer.com website earned $4.58 RPM in November 2017.

200.   Thus, the value of lost traffic in November 2017 due to Defendants' intentional and fraudulent malicious banner advertisements on spydialer.com was at least $6,893.

### The November 2017 Affiliate Advertising Losses

201.   As a direct result of the lower referrals from Google's search engine to Plaintiff's spydialer.com website in November 2017, attributable to Defendant Reya's intentional and fraudulent malicious banner advertisements, Plaintiff's affiliate advertising revenues also continued to drop.

202.   In November 2017, Plaintiff Spy Dialer's affiliate advertising agreements generated $12,648 of income, down $13,362 overall from the April 2017 baseline of $26,010.

### The December 2017 Traffic Loss

203.   In December 2017, referrals from Google's search engine results to Plaintiff's spydialer.com website dropped to 347,619 "sessions," a decline of 297,724 "sessions" attributable to Defendants' intentional and fraudulent malicious banner advertisements.

204.   According to Google Analytics, in December 2017, the pageviews per session at Plaintiff's spydialer.com website was 5.93 pages per session, equaling an overall loss for the month of 1,765,503 pageviews.

205.   According to Adnimation, Plaintiff's spydialer.com website earned $6.26 RPM in December 2017.

206.   Thus, the value of lost traffic in December 2017 due to Defendants' intentional and fraudulent malicious banner advertisements on spydialer.com was at least $11,052.

### The December 2017 Affiliate Advertising Losses

207.   As a direct result of the lower referrals from Google's search engine to Plaintiff's spydialer.com website in December 2017, attributable to Defendants'

intentional and fraudulent malicious banner advertisements, Plaintiff's affiliate advertising revenues also continued to drop.

208.  In December 2017, Plaintiff Spy Dialer's affiliate advertising agreements generated $9,564 of income, down $16,445 overall from the April 2017 baseline of $26,010.

### The January 2018 Traffic Loss

209.  In January 2018, referrals from Google's search engine results to Plaintiff's spydialer.com website began to recover, rising slightly to 293,753 "sessions," still a decline of 251,590 "sessions" attributable to Defendant Reya's intentional and fraudulent malicious banner advertisements.

210.  According to Google Analytics, in January 2018, the pageviews per session at Plaintiff's spydialer.com website was 5.97 pages per session, equaling an overall loss for the month of 1,501,992 pageviews.

211.  According to Adnimation, Plaintiff's spydialer.com website earned $4.35 RPM in January 2018.

212.  Thus, the value of lost traffic in January 2018 due to Defendants' intentional and fraudulent malicious banner advertisements on spydialer.com was at least $6,533.

### The January 2018 Affiliate Advertising Losses

213.  As a direct result of the lower referrals from Google's search engine to Plaintiff's spydialer.com website in January 2018, attributable to Defendants' intentional and fraudulent malicious banner advertisements, Plaintiff's affiliate advertising revenues also continued to remain below April 2017 baseline levels.

214. However, just as referrals from Google's search engine results to Plaintiff's spydialer.com website began to recover – if only slightly – in January 2018, Plaintiff's affiliate advertising revenues also rose modestly.

215. Nonetheless, in January 2018, Plaintiff Spy Dialer's affiliate advertising agreements generated $10,341 of income, down $15,669 overall from the April 2017 baseline of $26,010.

<u>The Known & Continuing Losses</u>

216. Thus, as a direct result of Defendants' intentional and fraudulent malicious banner advertisements on Plaintiff's spydialer.com website and the subsequent fallout, between September 2017 and January 2018, Plaintiff suffered at least <u>$36,035</u>[34] in losses from lost Internet traffic.

217. Similarly, as a direct result of Defendants' intentional and fraudulent malicious banner advertisements on Plaintiff's spydialer.com website and the subsequent fallout, between September 2017 and January 2018, Plaintiff suffered at least <u>$50,726</u>[35] in additional losses from lost revenue generated by affiliate advertising agreements.

218. As a direct result of continued damage to spydialer.com in Google's search engine results' rankings, attributable to Defendants' intentional and fraudulent malicious banner advertisements, Plaintiff Spy Dialer's monthly losses continue to toll.

219. As a direct result of continued damage to spydialer.com in Google's search engine results' rankings, attributable to Defendants' intentional and

---

[34] (September-$4,648)+(October-$6,909)+(November-$6,893)+(December-$11,052)+(January-$6,533).
[35] (September-$12,155)+(October-$9,510)+(Novem'r-$13,362)+(December-$16,445)+(January-$15,699).

1  fraudulent malicious banner advertisements, Plaintiff's referrals from Google have

2  yet to return to the April 2017 baseline of 645,343 sessions per month.

3      220.   The value of total future monthly losses to Plaintiff Spy Dialer as a

4  direct result of continued damage to spydialer.com in Google's search engine

5  results' rankings, attributable to Defendant Reya's intentional and fraudulent

6  malicious banner advertisements, is currently unknown and will be determined by

7  the parties and this Court at a later date.

8      221.   The value of lost monthly **gains** to Plaintiff Spy Dialer as a direct result

9  of continued damage to spydialer.com in Google's search engine results' rankings,

10  attributable to Defendant Reya's intentional and fraudulent malicious banner

11  advertisements, is unknown and an estimate will have to be calculated by the parties

12  and this Court at a later date.

13  <u>The Cost of Responding to & Rectifying the Loss</u>[36]

14      222.   Upon discovering the malicious code intentionally embedded in

15  Defendants' purchased advertisements, CEO Scott expended a substantial amount

16  of resources in the form of money and professional time in order to ascertain the

17  extent of the damage to spydialer.com.

18      223.   CEO Scott is an experienced technology executive, supra, as well as a

19  private investigator, licensed in the State of California since 1996.

20      224.   Also since 1996, CEO Scott has created and operated multiple well-

21  known websites that allow users to search public records for information.

22

23  ---

[36] *See also SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 981 (N.D. Cal. 2008) (citing *Shamrock Foods Co. v. Gast*, 535 F. Supp. 2d 962, 2008 U.S. Dist. LEXIS 15329, at *2-3 (D. Ariz.)) ("Where the offender has accessed protected information, discovering who has that information and what information he or she has is essential to remedying the harm. In such cases courts have considered the cost of discovering the identity of the offender or the method by which the offender accessed the protected information to be part of the loss for purposes of the CFAA.").

225.   CEO Scott is a nationally-recognized expert in investigations and public records, and he has specialized knowledge of the Internet, website operations, web-based advertising platforms, monetization of online content, and public records data.

226.   CEO Scott's specialized skills include: (1) monitoring, supervising, and evaluating website operations and traffic health; and (2) researching and investigating people, businesses, and domain names, including by way of public records data.

227.   CEO Scott acquired his specialized knowledge and skills through decades of experience, dating back at least as far as 1996.

228.   CEO Scott's specialized knowledge and skills are highly valuable and comparatively rare among members of society.

229.   At all times CEO Scott was working to rectify the damage caused by Defendant Reya, his professional time was valued at $240 per hour.

230.   On or about August 22, 2017, CEO Scott investigated an attack from an advertiser – said advertiser's identity being unknown to CEO Scott at the time – that was running malicious advertising banners for whoeasy.com on Plaintiff's spydialer.com website. This investigation took approximately 0.5 hours.

231.   CEO Scott then contacted Plaintiff's Advertising Platform, Adnimation, requesting that it block the offending advertising banners. This communication took approximately 0.2 hours.

232.   In total, on or about August 22, 2017, CEO Scott expended 0.7 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $168.

233.   On or about August 23, 2017, CEO Scott exchanged multiple e-mail communications with Adnimation on behalf of Plaintiff Spy Dialer, discussing the request to block the malicious whoeasy.com advertising banners. This exchange took approximately 0.3 hours.

234.   Further, CEO Scott monitored Plaintiff's spydialer.com website, observed the continuing attack of the malicious banner advertisements, and obtained the destination Uniform Resource Locator ("URL") to which the malicious banner advertisements diverted Plaintiff's customers. This series of tasks took approximately 0.5 hours.

235.   CEO Scott then consulted with Plaintiff Spy Dialer's Chief Technical Officer Rob Muehleisen ("CTO Muehleisen"), about the malicious banner advertisements and their diversion of Plaintiff's rightful web traffic, investigating the malicious code and methods of disabling it. This consultation took approximately 0.7 hours.

236.   Further observing the continuing attack of the malicious banner advertisements on Plaintiff's spydialer.com website, CEO Scott sent an e-mail communication to CTO Muehleisen, requesting that the latter document the attack by creating a duplication of the malicious computer code embedded within the banner advertisements. This communication took approximately 0.2 hours.

237.   Next, CEO Scott met online with CTO Muehleisen and directed the latter to develop and deploy computer code that could defend Plaintiff's spydialer.com website against the malicious banner advertisements and their exploitation of scrolling-and-focus-stealing. The two executives then tested and implemented the defense. This process took approximately 1.0 hours.

238.   CEO Scott documented Defendant Reya's abuse of the spydialer.com website by creating videos on his cellular telephone evidencing the effects of the offending advertisements on Plaintiff's website. This documentation took approximately 1.0 hours.

239.   In total, on or about August 23, 2017, CEO Scott expended 3.7 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $888.

240.   On or about August 24, 2017, CEO Scott reviewed the e-mail communications he had exchanged with Mr. Smith in February and March, supra, with the latter man acting as a representative of Defendant Reya. This review took approximately 0.3 hours.

241.   CEO Scott then met online with CTO Muehleisen to review their work and discuss the status of the malicious banner advertisements. This discussion took approximately 0.5 hours.

242.   CEO Scott again contacted Adnimation about blocking the malicious banner advertisements. This contact took approximately 0.2 hours.

243.   CEO Scott exchanged multiple e-mail communications with Mr. Smith, through the e-mail address jeff@whoeasy.com. This exchange took approximately 0.3 hours.

244.   CEO Scott investigated whoeasy.com and Defendant Reya by conducting various WHOIS searches and public record-lookups. This investigation took approximately 1.0 hours.

245.   In total, on or about August 24, 2017, CEO Scott expended 2.3 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $552.

246.   Also on or about August 24, 2017, Plaintiff Spy Dialer incurred out-of-pocket expenses.

247.   Plaintiff Spy Dialer paid a programming fee of $65 for an anti-scrolling/focusing code and implementation.

248.   Plaintiff Spy Dialer also paid a consulting fee of $130.

249.   In total, on or about August 24, 2017, Plaintiff Spy Dialer incurred $195 in out-of-pocket expenses in stopping and rectifying the damage caused by Defendant Reya.

250.   On or about August 25, 2017, CEO Scott again exchanged numerous e-mail communications with Mr. Smith. This exchange took approximately 0.7 hours, which should be valued at $168.

251.   On or about August 28, 2017, CEO Scott exchanged multiple e-mail communications with Adnimation, requesting a report on the number of malicious banner advertisements run by Defendant Reya. This exchange took approximately 0.3 hours.

252.   CEO Scott then drafted and sent an e-mail communication to Defendant Reya, through Mr. Smith. This writing took approximately 0.2 hours.

253.   Next, CEO Scott lodged a formal complaint regarding Defendant Reya's intentional and fradueltn malicious banner advertisements with Google Adsense on behalf of Plaintiff Spy Dialer. This filing took approximately 0.5 hours.

254.   CEO Scott exchanged multiple e-mail communications with Google representatives, including sending a detailed memorandum of the issues, "screenshots" of the offending advertisements, and samples of the malicious code. This exchange took approximately 1.5 hours.

255.   CEO Scott then received a spreadsheet from Adnimation, showing the number of Defendant Reya's malicious banner advertisements that had been run. His review of the spreadsheet took approximately 0.25 hours.

256.   In total, on or about August 28, 2017, CEO Scott expended 2.75 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $660.

257.   On or about August 29, 2017, CEO Scott continued to exchange e-mail communications with Google about Defendant Reya's malicious banner advertisements. This exchange took approximately 0.2 hours, which should be valued at $48.

258.   On or about August 30, 2017, CEO Scott continued to exchange e-mail communications with Google about Defendant Reya's malicious banner advertisements. This exchange took approximately 0.6 hours.

259.   In order to assist the Google investigation, CEO Scott researched further into the destination URLs of Defendant Reya's malicious banner advertisements. This research took approximately 0.75 hours.

260.   In total, on or about August 30, 2017, CEO Scott expended 1.35 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $324.

261. On or about August 31, 2017, CEO Scott sent an e-mail communication to Google about its investigation of Defendant Reya's malicious banner advertisements on behalf of Plaintiff Spy Dialer. This drafting took approximately 0.2 hours.

262. CEO Scott later received an e-mail communication from an attorney purporting to represent Defendant Reya. His review of this e-mail took approximately 0.25 hours.

263. In response, CEO Scott contacted Plaintiff Spy Dialer's attorney, undersigned counsel. This contact took approximately 0.1 hours.

264. CEO Scott researched Google's Ad Validator, which was referenced in the e-mail from Defendant Reya's attorney. This research took approximately 1.0 hours.

265. In total, on or about August 31, 2017, CEO Scott expended 1.55 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $372.

266. On or about September 1, 2017, CEO Scott exchanged numerous e-mail communications with Google representatives about its investigation into Defendant Reya's malicious banner advertisements. This exchange took approximately 1.2 hours, which should be valued at $288.

267. On or about September 3, 2017, CEO Scott received an e-mail communication from Google regarding its investigation into Defendant Reya's malicious banner advertisements. His review of this e-mail took approximately 0.1 hours, which should be valued at $24.

268.   On or about September 4, 2017, CEO Scott undertook preliminary research aimed at ascertaining the impact of Defendant Reya's malicious banner advertisements on page views and monetization of Plaintiff's spydialer.com website. This research took approximately 1.0 hours.

269.   CEO Scott then exchanged multiple e-mail communications with Adnimation on the impact of Defendant Reya's malicious banner advertisements on page views and monetization of Plaintiff's spydialer.com website. This exchange took approximately 0.4 hours.

270.   Next, on behalf of Plaintiff Spy Dialer, CEO Scott exchanged numerous e-mail communications with its attorney, undersigned counsel. This exchange took approximately 0.3 hours.

271.   In total, on or about September 4, 2017, CEO Scott expended 1.7 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $408.

272.   On or about September 5, 2017, CEO Scott reviewed Google Adwords' and Google Analytics' dashboards, which allowed him to determine the relevant metrics that Plaintiff Spy Dialer would need to acquire from Defendant Reya in order to ascertain the extent of the damage caused. This analysis took approximately 1.2 hours.

273.   CEO Scott then exchanged multiple e-mail communications with Plaintiff Spy Dialer's attorney, undersigned counsel. This exchange took approximately 0.5 hours.

274.   Further, CEO Scott exchanged e-mail communications with Google about its investigation into Defendant Reya's malicious banner advertisements. This exchange took approximately 0.3 hours.

275.   In total, on or about September 5, 2017, CEO Scott expended 2.6 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $624.

276.   On or about September 6, 2017, CEO Scott further discussed Defendant Reya's malicious banner advertisements with CTO Muehleisen. This discussion took approximately 0.25 hours.

277.   CEO Scott received CTO Muehleisen's analysis of the destination URLs for Defendant Reya's malicious banner advertisements. His review of this analysis took approximately 0.2 hours.

278.   CEO Scott exchanged more than ten e-mail communications with Google regarding its investigation into Defendant Reya's malicious banner advertisements. This exchange, which included time reviewing samples of Defendant Reya's malicious banner advertisements, took approximately 1.25 hours.

279.   In total, on or about September 6, 2017, CEO Scott expended 1.7 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $408.

280.   On or about September 8, 2017, CEO Scott exchanged multiple e-mail communications with Google about its investigation into Defendant Reya's malicious banner advertisements. This exchange took approximately 0.5 hours, which should be valued at $120.

281.   On or about September 11, 2017, CEO Scott undertook an investigation to determine the identities, locations, and backgrounds of Defendant Reya's principals, delving through public records sources and various research. During this investigation, CEO Scott learned that Defendant domain-name Spydialer.org also belonged to Defendant Reya. This investigation took approximately 2.5 hours.

282.   CEO Scott then sent an e-mail communication to Plaintiff Spy Dialer's attorney, undersigned counsel, and reviewed e-mail communications from an attorney purporting to represent Defendant Reya. These communications took approximately 0.25 hours.

283.   CEO Scott continued to exchange e-mail communications with Google about its investigation into Defendant Reya's malicious banner advertisements. This exchange took approximately 0.4 hours.

284.   In total, on or about September 11, 2017, CEO Scott expended 2.95 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $708.

285.   On or about September 12, 2017, CEO Scott continued his research into Defendant domain-name Spydialer.org. This research took approximately 0.5 hours.

286.   CEO Scott exchanged additional e-mail communications with Google about its investigation into Defendant Reya's malicious banner advertisements. This exchange took approximately 0.2 hours.

287.   In total, on or about September 12, 2017, CEO Scott expended 0.7 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $168.

288.   On or about September 13, 2017, CEO Scott exchanged multiple e-mail communications with Adnimation about Defendant Reya's malicious banner advertisements and their impact on page views and monetization of Plaintiff's spydialer.com website. This exchange took approximately 0.3 hours, which should be valued at $72.

289.   On or about September 14, 2017, CEO Scott reviewed a letter from Defendant Reya's attorney. This review took approximately 0.5 hours.

290.   CEO Scott then reviewed the Terms of Service for Google Ad Services, as they had been referenced by Defendant Reya's attorney in his letter. This review took approximately 0.5 hours.

291.   CEO Scott conducted a further review of the Google Ad Validator, which was also referenced by Defendant Reya's attorney in his letter. This review took approximately 0.5 hours.

292.   On behalf of Plaintiff Spy Dialer, CEO Scott then exchanged multiple e-mail communications with Plaintiff's attorney, undersigned counsel. This exchange took approximately 0.2 hours.

293.   In total, on or about September 14, 2017, CEO Scott expended 1.7 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $408.

294.   On or about September 15, 2017, on behalf of Plaintiff Spy Dialer, CEO Scott exchanged multiple e-mail communications with Plaintiff's attorney, undersigned counsel. This exchange took approximately 0.6 hours.

295.   CEO Scott then received an e-mail communication from Google about its investigation into Defendant Reya's malicious banner advertisements. His review of the e-mail took approximately 0.6 hours.

296.   In total, on or about September 15, 2017, CEO Scott expended 1.2 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $288.

297.   On September 18, 2017, CEO Scott exchanged multiple e-mail communications with Google about its investigation into Defendant Reya's malicious banner advertisements. This exchange took approximately 0.5 hours, which should be valued at $120.

298.   On or about September 19, 2017, CEO Scott exchange further e-mail communications with Google about its investigation into Defendant Reya's malicious banner advertisements. This exchange took approximately 0.3 hours, which should be valued at $72.

299.   On or about September 21, 2017, CEO Scott exchanged additional e-mail communications with Google about its investigation into Defendant Reya's malicious banner advertisements. This exchange took approximately 0.3 hours, which should be valued at $72.

300.   On or about September 22, 2017, CEO Scott received an e-mail communication from Google about its investigation into Defendant Reya's malicious banner advertisements. His review of this e-mail communication took approximately 0.1 hours, which should be valued at $24.

301.   On September 23, 2017, CEO Scott received another e-mail communication from Google about its investigation into Defendant Reya's

malicious banner advertisements. His review of this e-mail communication took approximately 0.1 hours, which should be valued at $24.

302.   On September 24, 2017, CEO Scott received yet another e-mail communication from Google about its investigation into Defendant Reya's malicious banner advertisements. His review of this e-mail communication took approximately 0.1 hours, which should be valued at $24.

303.   On September 25, 2017, CEO Scott exchanged multiple e-mail communications with Google about its investigation into Defendant Reya's malicious banner advertisements. This exchange took approximately 0.5 hours.

304.   CEO Scott then researched the affiliate advertising program and the loss of revenue caused by Defendant Reya's malicious banner advertisements. This research took approximately 1.0 hours.

305.   In total, on or about September 25, 2017, CEO Scott expended 1.5 hours toward stopping and rectifying the damage caused by Defendant Reya, which should be valued at $360.

306.   On or about October 10, 2017, CEO Scott checked Defendant domain-name Spydialer.org's ranking in a list of Google search engine results for the terms "Spy Dialer." This activity took approximately 0.1 hours, which should be valued at $24.

307.   Thus, in order to stop and rectify the damage caused by Defendant Reya's malicious banner advertisements on Plaintiff's spydialer.com website, between August 22, 2017, and October 10, 2017, CEO Scott expended approximately 30.9 hours, which should be valued at $7,416.

# CAUSES OF ACTION

## First Cause of Action

### Defendants' Violations of the Computer Fraud & Abuse Act ("CFAA")

### 18 U.S.C. §§ 1030 et seq.

308. By this reference, Plaintiff Spy Dialer incorporates the preceding paragraphs, as if set forth fully herein.

309. Defendants committed hundreds of thousands, if not millions, of violations of multiple clauses of the Computer Fraud and Abuse Act (the "CFAA")[37] over the course of the May 2017 through August 2017 time period in which Reya's intentional and fraudulent malicious banner advertisements were published on Plaintiff's spydialer.com website on approximately ten million occasions.

310. The CFFA provides that "[w]hoever . . . [i]ntentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer . . . shall be punished as provided in subsection (c) of this section."[38]

311. Thus, the CFAA makes punishable an individual's intentional access of another's computer under particular conditions, i.e., when said computer access is unauthorized or exceeds the bounds of the individual's authority, and when the individual also obtains information from the aforementioned computer.

312. A "protected computer" is a computer "which is used in or affecting interstate [] commerce or communication . . ."[39]

---

[37] The United States Supreme Court has expressly stated that the rule of lenity applies only where a criminal statute suffers from "grievous ambiguity." *Muscarello v. United States*, 524 U.S. 125, 139 (1998). Furthermore, as the Supreme Court explained, the "simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *Muscarello*, 524 U.S. at 138.
[38] 18 U.S.C. § 1030(a)(2)(C) (alterations added).
[39] 18 U.S.C. § 1030(e)(2)(B) (alterations added).

48

313.   Any device that processes data and connects to the Internet falls within the ambit of a "protected computer."[40]

314.   "[T]he term 'exceeds authorized access' means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accessor is not entitled so to obtain or alter . . ."[41]

315.   Plaintiff's spydialer.com website is a protected computer, the servers which host Plaintiff's website are protected computers, and all devices that members of the public use to access and visit Plaintiff's website are protected computers.

316.   Defendants were given extremely limited authority to access Plaintiff's spydialer.com website and the servers upon which it is hosted by virtue of Defendants' agreement with the Advertising Platforms to place banner advertisements on spydialer.com.

---

[40] *See United States v. Yücel*, 97 F. Supp. 3d 413, 418 (S.D.N.Y. 2015) ("The government contends that [the CFAA's] definition [of a protected computer] encompasses any computer with an internet connection, and a number of court's have so held. *See Freedom Banc Mortg. Servs., Inc. v. O'Harra*, 2012 U.S. Dist. LEXIS 125734, at *6 (S.D. Ohio Sept. 5, 2012) (holding that '[a] computer that is connected to the internet . . . satisfies § 1030(e)(2)'s interstate commerce requirement even if the plaintiff used that connection to engage in only intrastate communications"); *United States v. Fowler*, 2010 U.S. Dist. LEXIS 118260, at *2 (M.D. Fla. Oct. 25, 2010) (holding that evidence that computers were connected to the internet and were used to send emails was sufficient to show that they were 'protected'); *Multiven, Inc. v. Cisco Systs., Inc.*, 725 F. Supp. 2d 887, 891-92 (N.D. Cal. 2010) (holding that the parties' agreement that the defendant's network was connected to the internet was sufficient to establish that the computers using the network were 'protected'); *Expert Janitorial, LLC v. Williams*, 2010 U.S. Dist. LEXIS 23080, at *8 (E.D. Tenn. Mar. 12, 2010) (holding that the allegation that a computer was used to access email accounts, and thus connected to the internet, was sufficient to satisfy the 'protected computer' requirement)."). *See also BHL Boresight, Inc. v. Geo-Steering Solutions, Inc.*, 2016 U.S. Dist. LEXIS 44729, at *45-46 (S.D. Tex. March 29, 2016) ("[C]ourts regularly conclude that systems and devices that function with individual data processing devices are covered by the statute. *See, e.g.*, *Genesco Sports Enter., Inc. v. White*, 2011 U.S. Dist. LEXIS 147599, at *5 (N.D. Tex. Oct. 27, 2011), *report and recommendation adopted*, 2011 U.S. Dist. LEXIS 147063 (N.D. Tex. Dec. 22, 2011) (corporate server is protected computer); *Donahue v. Tokyo Electron Am., Inc.*, 42 F. Supp. 3d 829, 843 (W.D. Tex. 2014) (computer network is protected computer). *See also NovelPoster v. Javitch Canfield Group*, 140 F. Supp. 3d 938, at *13 n.4 (N.D. Cal. Aug. 4, 2014) (online accounts are protected computer). . . . [Devices that] provide data storage functions [are] potentially [] within the ambit of the definition of a computer ('computer' . . . includes any data storage facility . . . directly related to or operating in conjunction with such [data processing] device.').").

[41] 18 U.S.C. § 1030(e)(6) (alterations added).

49

317. This extremely limited authority allowed Defendants to pull visitors from Plaintiff's spydialer.com website to its own whoeasy.com website, **so long as said visitors affirmatively chose to change websites**, such as by scrolling through Plaintiff's website, seeing Defendant Reya's banner advertisement, and clicking on it, or by clicking in the search box therein and entering information.

318. Defendants greatly exceeded the bounds of this extremely limited authority by removing the element of choice from the decision of whether or not to engage with the banner advertisements, as detailed supra.

319. In removing the element of choice from visitors to Plaintiff's spydialer.com website, Defendants greatly exceeded its permissions to access Plaintiff's website and the servers upon which it is hosted.

320. In exceeding the scope of its authority, Defendants obtained information from Plaintiff's spydialer.com website and the servers upon which it is hosted, i.e., Defendants obtained the visitors that had affirmatively chosen to visit Plaintiff's website through the servers upon which it is hosted, as well as said visitors' electronic information.[42]

321. Defendants exceeded this access and obtained the information from Plaintiff Spy Dialer intentionally and fraudulently, by creating the technically-sophisticated malicious code,, embedding the malicious code into its banner advertisements, submitting the malicious code to the Advertising Platforms, and allowing the malicious code to be published on Plaintiff's spydialer.com website.

---

[42] "In the 1996 amendments to section 1030, Congress clarified that section 1030(a)(2) would 'ensure that the theft of intangible information by the unauthorized use of a computer is prohibited in the same way theft of physical items are protected.'" H. Marshall Jarrett, Michael W. Bailie, Ed Hagen, and Scott Eltringham, *Prosecuting Computer Crimes*, p.18 (Office of Legal Ed. Jan. 14, 2015) www.justice.gov/sites/default/files/criminal-ccips/legacy/2015/01/14/ccmanual.pdf (quoting S. Rep. No. 104-357, at 7, *available at* 1996 WL492169).

322.   Further, Defendants had no authority to access the computers of the visitors to Plaintiff's spydialer.com website, absent said visitors' affirmative decisions to engage with Reya's malicious banner advertisements.

323.   However, Defendants did connect to and access said visitors' computers, without their authorization or even their knowledge, and obtained from them their electronic information, as well as the telephone numbers that the visitors had sought out Plaintiff's spydialer.com website to search.

324.   Defendants engaged in the unauthorized accesses of Plaintiff's visitors' computers and obtained the information therefrom intentionally, by creating the technically-sophisticated malicious code, embedding the malicious code into its banner advertisements, submitting the malicious code to the Advertising Platforms, and allowing the malicious code to be published on Plaintiff's spydialer.com website.

325.   As discussed, supra, Defendants' intentional and fraudulent malicious banner advertisements appeared on Plaintiff's spydialer.com website on approximately ten million occasions over the course of several months.

326.   Defendants no doubt exceeded its accesses of Plaintiff's spydialer.com website, as well as the servers upon which the website is hosted, on occasions numbering in the hundreds of thousands, if not well into the millions.

327.   Defendants no doubt engaged in the unauthorized accesses of the computers of visitors to Plaintiff's spydialer.com website on occasions numbering in the hundreds of thousands, if not well into the millions.

328.   While the CFAA is a criminal statute, "[a]ny person who suffers damage or loss by reason of a violation [thereof] may maintain a civil action against

the violator to obtain compensatory damages and injunctive relief or other equitable relief," so long as the violation "involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)."[43]

329.   One of the factors that may be found before a civil action under the CFAA is permitted is a "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value . . ."[44]

330.   Under the CFAA, "the term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of an interruption of service . . ."[45]

331.   Defendants'   intentional   and   fraudulent   malicious   banner advertisements on Plaintiff's spydialer.com website – and the unauthorized accesses and accesses beyond the scope of Reya's very limited authority that the malicious banner advertisements facilitated – amounted to hundreds of thousands of dollars in damage to Plaintiff Spy Dialer, which clearly satisfies the $5,000 threshold loss required for a civil action under the CFAA.[46]

332.   The CFAA further provides that "[w]hoever . . . knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and

---

[43] 18 U.S.C. § 1030(g) (alterations added).
[44] 18 U.S.C. § 1030(c)(4)(A)(i)(I) (alterations added).
[45] 18 U.S.C. § 1030(e)(11) (alteration added).
[46] *See supra.*

obtains anything of value . . . shall be punished as provided in subsection (c) of this section."[47]

333.   Defendants' intentional and malicious banner advertisements on Plaintiff's spydialer.com website – and the unauthorized accesses and accesses beyond the scope of Reya's very limited authority that the malicious banner advertisements facilitated – were for the intentional purpose of defrauding Plaintiff Spy Dialer, defrauding those entities with whom Plaintiff had affiliate advertising agreements, and defrauding the visitors to Plaintiff's spydialer.com website.[48]

334.   Defendants' malicious banner advertisements were trickery, deceitful, and amounted to a fraudulent act.

335.   Defendants had to specifically undertake numerous intentional acts in order to create the malicious code.

336.   First, Defendants identified an opportunity to derive more financial benefit from their advertising budget.

---

[47] 18 U.S.C. § 1030(a)(4) (alterations added).

[48] *See* Jarrett, *supra*, *Prosecuting Computer Crimes*, p.27 (citing 132 Cong. Rec. 7128, 7129, 99th Cong., 2d Sess. (1986)) ("The phrase 'knowingly and with intent to defraud' is not defined by section 1030. Very little case law under section 1030 exists as to its meaning, leaving open the question of how broadly a court will interpret the phrase. When Congress added this subsection in 1986, a Senate cosponsor's comments suggested that Congress intended section 1030(a)(4) to punish attempts to steal valuable data and not to punish mere unauthorized access . . ."); *see also id.* at p.29 (alterations added) (internal citations omitted) ("In the context of the [CFAA], district courts addressing the issue have held that, as in wire and mail fraud cases, there is no need to plead the elements of common law fraud. In . . . a civil case involving section 1030(a)(4), the court favored an expansive interpretation of 'intent to defraud.' In denying the defendant's motion to dismiss, the court held that the word 'fraud' as used in section 1030(a)(4) simply means 'wrongdoing' and does not require proof of the common law elements of fraud. . . . Thus, the plaintiff stated a sufficient cause of action under section 1040(a)(4) by alleging that the defendant participated in 'dishonest methods to obtain the plaintiff's secret information.' [The case] does not directly address the Supreme Court's decisions in the mail or wire fraud contexts, but nevertheless provides some basis for interpreting 'fraud' in its broadest sense (i.e., finding 'fraud' when there is evidence of 'wrongdoing,' as opposed to requiring proof of 'trick, deceit, chicane, or overreaching').").

337.   Next, Defendants reviewed the existing code base on their existing advertisements.

338.   Next, Defendants opened their unknown programming software platform.

339.   Next, Defendants began drafting characters of code, designed to initiate the fraudulent display to consumers.

340.   Alternatively, Defendants researched existing code on the Internet or via some other resource available to Defendant.

341.   Next, Defendants embedded this code into the underlying code of their existing banner advertisements.

342.   By means of Defendants' unauthorized accesses of protected computers and accesses of protected computers beyond the scope of Defendants' very limited authority – facilitated by the malicious banner advertisements – Defendants' fraud was furthered, in that Defendants were able to steal Plaintiff Spy Dialer's customers, steal revenues generated by such customers, and deceitfully convince Plaintiff's customers to become paying subscribers of Defendants' services at whoeasy.com.[49]

343.   Defendants intentionally interfered with Plaintiff Spy Dialer's relationships with its customers and affiliate advertising partners, and Defendants

---

[49] *Id.* at pp.31-32 (alterations added) (internal citations omitted) ("The term 'by means of such conduct' explicitly links the unauthorized accessing of a protected computer to the furthering of the intended fraud. In creating this link, Congress wished to distinguish those cases of computer trespass where the trespass is used to further the fraud (covered by section 1030(a)(4)) from the cases of fraud that involve a computer but the computer is only tangential to the crime . . . In order to fall within section 1030(a)(4), 'the use of the computer must be more directly linked to the intended fraud.' More explicitly, a fraudulent scheme does not constitute computer fraud just because a computer was used 'to keep records or to add up [the] potential 'take' from the crime.'").

obtained actual monetary benefits of an ascertainable value by virtue of its interference.[50]

344.   Further, by means of Defendants' unauthorized accesses of protected computers and accesses of protected computers beyond the scope of Defendants' very limited authority – facilitated by the malicious banner advertisements – Defendants also obtained information and data of value from Plaintiff Spy Dialer and visitors to Plaintiff's spydialer.com website.

345.   Similarly, Defendants' unauthorized accesses of protected computers and accesses of protected computers beyond the scope of Defendants' very limited authority – facilitated by the malicious banner advertisements – allowed Defendants to steal customers directly from Plaintiff Spy Dialer, as well as those customers of Plaintiff's affiliate advertising partners.

346.   Further, Defendants' unauthorized accesses of protected computers and accesses of protected computers beyond the scope of Defendants' very limited authority – facilitated by the malicious banner advertisements – deprived Plaintiff Spy Dialer of hundreds of thousands of dollars of monetary benefits.

---

[50] *Id.* at p. 33-34 (alterations added) ("The parameters of what constitutes a 'thing of value' were [] explored in *In re America Online, Inc.*, 168 F. Supp. 2d 1359 (S.D. Fla. 2001). Specifically, American Online (AOL) was sued by computer users and competitor Internet service providers, alleging that AOL's software had caused damage to users' computers and had blocked utilization of competitors' software by potential users. *Id.* In moving to dismiss the section 1030(a)(4) allegation, AOL argued that the plaintiffs could not make out an actionable claim because they had failed to plead that AOL had deprived them of 'anything of value.' *Id.* at 1379. In response, the plaintiffs asserted that AOL's actions had deprived them of their subscribers 'custom and trade' and that this interest constituted a 'thing of value.' *Id.* . . . Noting that the 'typical item of value' in a case brought under the CFAA is usually data, the [*America Online*] court observed that 'in other areas of the law, customers have been found to be a thing of value.' *Id.* at 1380. The court therefore found that 'damage to an ISP's goodwill and reputation is actionable under the CFAA' and that '[b]ecause [the plaintiff] has alleged that AOL's actions have interfered with its relationships with its existing customers and potential subscribers, it has alleged that AOL has obtained something of value within the meaning of 18 U.S.C. § 1030(a)(4).' *Id.*").

347.   The CFAA also provides that "[w]hoever . . . knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer . . . shall be punished as provided in subsection (c) of this section."[51]

348.   "[T]he term 'damage' means *any impairment* to the integrity or availability of data, a program, a system, or information . . ."[52]

349.   Defendants' knowingly created the malicious code that underlay its banner advertisements, and Defendants' knowingly transmitted said malicious code in the form of the banner advertisements to the Advertising Platforms, fully aware that said banner advertisements would then be published on Plaintiff's spydialer.com website.

350.   Defendants' malicious banner advertisements damaged Plaintiff's spydialer.com website, preventing visitors thereto from utilizing Plaintiff's services, i.e., making Plaintiff's services through its website unavailable.

351.   Similarly, Defendants' malicious banner advertisements damaged the devices by which individuals accessed Plaintiff's spydialer.com website, preventing Plaintiff and its visitors from exchanging the data for which the website had been created.

352.   Defendants had no authorization to cause damage to either Plaintiff's spydialer.com website, the servers upon which Plaintiff's website is hosted, or the devices by which individuals accessed Plaintiff's website.

---

[51] 18 U.S.C. § 1030(a)(5)(A) (alterations added).
[52] 18 U.S.C. § 1030(e)(8) (alterations and emphasis added).

353.   Defendants intentionally caused said damage to Plaintiff's spydialer.com website, the servers upon which Plaintiff's website is hosted, and the devices by which individuals accessed Plaintiff's website, in that Defendants' intentionally created the malicious code that underlay its banner advertisements and passed said advertisements on to the Advertising Platforms with the intention that the malicious banner advertisements be published on Plaintiff's website, and the damage that was wrought by the malicious banner advertisements was a necessary side effect of Defendants' ability to benefit from the malicious banner advertisements, i.e., in order for Defendants to siphon off Plaintiff's web traffic and steal Plaintiff's customers, it was necessary that Defendants also damage hundreds of thousands, if not millions, of protected computers.

354.   Because Defendants' conduct was intentional, and because the damage to the protected computers was a necessary side effect of such conduct, Defendants' intentionally caused damage, without authorization, to hundreds of thousands, if not millions, of protected computers.

355.   The CFAA further provides that "[w]hoever . . . intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage . . . shall be punished as provided in subsection (c) of this section."[53]

356.   Defendants intentionally accessed hundreds of thousands, if not millions, of protected computers.[54]

357.   Defendants intentional accesses were without authorization from the owners of said protected computers.

---

[53] 18 U.S.C. § 1030(a)(5)(B) (alterations added).

[54] *See supra.*

57

358.   Defendants intentional, unauthorized accesses caused damage to Plaintiff Spy Dialer, and Defendants' conduct was reckless in so doing.

359.   The CFAA also provides that "[w]hoever . . . intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss . . . shall be punished as provided in subsection (c) of this section."[55]

360.   Defendants intentionally accessed hundreds of thousands, if not millions, of protected computers.[56]

361.   Defendants' intentional accesses were without authorization from the owners of said computers.

362.   Defendants' intentional, unauthorized accesses caused damage to Plaintiff Spy Dialer, and Plaintiff also suffered losses therefrom.

## Second Cause of Action

## Defendants' Violations of the Electronic Communications Privacy Act ("ECPA"); 18 U.S.C. §§ 2510 et seq.

363.   By this reference, Plaintiff Spy Dialer incorporates the preceding paragraphs, as if set forth fully herein.

364.   Defendants committed hundreds of thousands, if not millions, of violations of multiple clauses of the Electronic Communications Privacy Act (the "ECPA") over the course of the May 2017 through August 2017 time period in which Reya's malicious banner advertisements were published on Plaintiff's spydialer.com website on approximately ten million occasions.

---

[55] 18 U.S.C. § 1030(a)(5)(C) (alterations added).

[56] Indeed, while Spy Dialer only makes allegations as to its *own* computers, there are likely millions of potential plaintiffs, as a matter of law.

365.   The ECPA provides that "any person who . . . intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication . . . shall be punished . . .".[57]

366.   The ECPA defines "intercept" to mean the "acquisition of the contents of any wire, electronic, or oral communication through the use of an electronic, mechanical, or other device."[58]

367.   Likewise, the ECPA explains that "electronic communications" include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . .",[59] aside from a handful of exceptions that are inapplicable here.[60]

368.   For purposes of construing the text of the ECPA, an "'electronic, mechanical, or other device' means any device[61] or apparatus which can be used to intercept a wire, oral, or electronic communication . . .",[62] aside from two exceptions that are inapplicable here.[63]

369.   Defendants intentionally and fraudulently created a device or apparatus in the form of the malicious code underlying their banner advertisements, designed as a sophisticated mechanism to perform several highly specific functions, including

---

[57] 18 U.S.C. § 2511(1)(a) (alterations added).
[58] 18 U.S.C. § 2510(4).
[59] 18 U.S.C. § 2510(12).
[60] *See* 18 U.S.C. § 2510(12)(A)-(D).
[61] While the statute does not define "device," Merriam-Webster defines "device" as "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function." *Device Definition*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/device (last visited July 6, 2018).
[62] 18 U.S.C. § 2510(5).
[63] *See* 18 U.S.C. § 2510(5)(a)-(b).

to automatically relocate the computer cursors, hijack the computer screens, and redirect the search inquiries of visitors to Plaintiff's spydialer.com.

370.   Defendants intentionally implemented and used their malicious banner advertisements, linked to its whoeasy.com website, in order to intercept the electronic communications, in the form of telephone number search inquiries, that visitors to Plaintiff's spydialer.com website intended to communicate to Plaintiff.

371.   Further, Defendants intentionally implemented and used their malicious banner advertisements, linked to their websites, in order to intercept the visitors to Plaintiff's spydialer.com website themselves, as well as the electronic information said visitors necessarily communicated to the websites that they visited.

372.   Defendants' interceptions of such electronic communications through its malicious banner advertisements were intentional, in that Defendants purposefully created the technically-sophisticated malicious code, purposefully embedded the malicious code into the code underlying the banner advertisements, and purposefully caused the banner advertisements to be published on Plaintiff's spydialer.com website in order to intercept visitors to Plaintiff's website and their accompanying electronic information.

373.   Moreover, although Defendants only managed to actually intercept a percentage of the visitors to Plaintiff's spydialer.com website, each publication of Defendants' malicious banner advertisements on Plaintiffs website amounted to a discrete endeavor to intercept said visitors.

374.   Thus, Defendants violated this clause of the ECPA each time its malicious banner advertisements were published on Plaintiff's spydialer.com website, which amounts to approximately ten million violations in total.

375.   Like the CFAA, the ECPA is a criminal statute, but it also provides for a civil cause of action, which may be initiated by "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of [18 U.S.C. §§ 2510 et seq.] . . .".[64]

376.   Defendants used their malicious banner advertisements as devices to intentionally intercepted electronic communications and information intended to be communicated to Plaintiff Spy Dialer through its spydialer.com website, which provides Plaintiff with a civil cause of action against Defendants under the ECPA.

377.   The ECPA further provides that "any person who . . . intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection . . . shall be punished . . .".[65]

378.   Defendants had knowledge of the fact that their malicious banner advertisements on Plaintiff's spydialer.com website were devices used to intercept electronic communications that visitors to Plaintiff's website meant to be conveyed to Plaintiff.

379.   With this knowledge, Defendants nonetheless intentionally endeavored to use and actually did use said intercepted electronic communications, and Defendant Reya profited from such use.

380.   Defendants violated this provision of the ECPA each time its malicious banner advertisements caused a visitor to Plaintiff's spydialer.com website to be redirected to Defendants' websites, where Reya endeavored to use the intercepted

[64] 18 U.S.C. § 2520(a) (alterations added).
[65] 18 U.S.C. § 2511(1)(d) (alterations added).

1  electronic communications to turn each unwitting visitor into a paying customer of

2  its own.

3      381.  Thus, Defendants' violations of this provision of the ECPA likely

4  include hundreds of thousands, if not millions, of discrete violations.

5  **Third Cause of Action**

6  **Defendants' Violations of 15 U.S.C. § 1125, et seq. False Designation of**

7  **Origin & False Advertising**

8      382.  By this reference, Plaintiff Spy Dialer incorporates the preceding

9  paragraphs, as if set forth fully herein.

10      383.  Defendants are liable to Plaintiff Spy Dialer for false designation of

11  origin and false advertising by virtue of its placement of the intentional and

12  fraudulent malicious banner advertisements on Plaintiff's spydialer.com website.

13      384.  The Lanham Act provides that "[a]ny person who, on or in connection

14  with any goods or services, or any container for goods, uses in commerce any word,

15  term, name, symbol, or device, or any combination thereof, or any false designation

16  of origin, false or misleading description of fact, or false or misleading

17  representation of fact, which [] is likely to cause confusion, or to cause mistake, or

18  to deceive as to the affiliation, connection, or association of such person with another

19  person, or as to the origin, sponsorship, or approval of his or her goods, services, or

20  commercial activities by another person . . . shall be liable in a civil action by any

21  person who believes that he or she is or is likely to be damaged by such act."

22      385.  In placing its intentional and fraudulent malicious banner

23  advertisements on Plaintiff's spydialer.com website, Defendant Reya linked its own

24  whoeasy.com website therewith, leading to an extreme likelihood of confusion and

25

1  deception as to the affiliation, connection, or association of the parties and their

2  competing websites.

3       386.   The "search bar" in the advertisement, created by the malicious code,

4  emulated the search bar on the Spy Dialer website, creating consumer confusion,

5  because it looked similar to the search bar shown on the Spy Dialer website.

6       387.   The Defendants' carefully designed "focus stealing" action was also

7  false and misleading, and created consumer confusion, because it forced a user's

8  computer cursor into the Reya advertisement, misleading a consumer into believing

9  that they were searching for information on SpyDialer.com.

10      388.   Plaintiff Spy Dialer's reputation, as well as the reputation of its

11  spydialer.com website, were severely damaged by Defendant Reya's placement of

12  the intentional and fraudulent malicious banner advertisements on Plaintiff's

13  website, as visitors thereto would have likely been made to believe that Plaintiff was

14  attempting to trick and deceive them with a bait-and-switch scheme.

15      389.   Thus, Defendant Reya committed a violation of the Lanham Act on

16  each occasion that an unwitting visitor to Plaintiff's spydialer.com website  was

17  unintentionally and unknowingly redirected to Defendant's whoeasy.com website

18  through the intentional and fraudulent malicious banner advertisements and was

19  subsequently confused as to the affiliation, connection, or association between the

20  parties and their websites.

21      390.   Defendant Reya's violations of the Lanham Act likely amounted to

22  hundreds of thousands, if not millions, of discrete occurrences.

23      391.   Moreover, Defendants' deliberate registration of the SpyDialer.org

24  domain name incorporating the SPY DIALER mark, despite having no such

25

common law rights, constituted a false designation of origin under the Lanham Act, as explained in detail in the allegations contained below, under 15 U.S.C. § 1125(d).

### Fourth Cause of Action

### Defendants' Violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d)

392.   By this reference Plaintiff Spy Dialer incorporates the preceding paragraphs, as if set forth fully herein.

393.   All Defendants are liable to Plaintiff Spy Dialer for cyberpiracy through their creation and registration of the domain name Spydialer.org.

394.   The Anticybersquatting Consumer Protection Act (the "ACPA") provides that "[a] person shall be liable in a civil action by the owner of a mark, . . . if, without regard to the goods or services of the parties, that person [] has a bad faith intent to profit from that mark, . . . and registers, traffics in, or uses a domain name that [] in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark . . .".[66]

395.   Plaintiff Spy Dialer is the owner of the SPY DIALER mark in the United States, having used it in commerce continuously since 2011 and having common law trademark rights thereto.

396.   Plaintiff's SPY DIALER mark has achieved secondary meaning within the public records-search and telephone number-lookup industries.

397.   The unknown registrant of domain name Spydialer.org, alleged to be Defendants, registered said domain name under a protected name and address with a bad faith intent to profit from Plaintiff's SPY DIALER mark or otherwise trade on

---

[66] 15 U.S.C. § 1125(d)(A)(i) and (ii)(I) (alterations added).

1    Plaintiff's rights in the mark by implying, prima facie, that the domain name is
2    affiliated with or approved by Plaintiff Spy Dialer.

3        398.   The registrant of the domain name would have had to specifically
4    undertake numerous intentional acts to register the infringing domain name.

5        399.   First, the Defendants would have had to identify Plaintiff as a
6    successful competitor in their industry.

7        400.   Next, Defendants would have had to identify available domain names
8    to register.

9        401.   Next, Defendants would have had to identify the SpyDialer.org domain
10   name as a domain name available for purchase.

11       402.   Next, Defendants would have had to create an account at one of any
12   domain name registrars licensed by the Internet Corporation for Assigned Names
13   and Numbers (ICANN).

14       403.   Next, Defendants would have had to pay a fee to register the domain
15   name.

16       404.   The registration of the domain name, in and of itself, would constitute
17   a violation of the ACPA.

18       405.   However, Defendants also created a competing website and advertised
19   it in interstate commerce. *See* Exhibit #4.

20       406.   Defendants also self-identified the owner of the website SpyDialer.org
21   as Reya, LLC in the Terms of Service. *Id.*

22       407.   The competing website provided identical goods and services as
23   SpyDialer.com.

24

25

1    408.   Defendants had a bad faith intent to profit from its use of the infringing

2    domain name.

3    409.   Defendants registered the infringing domain name.

4    410.   Defendants used and "trafficked in" the domain name.

5    411.   The "Terms of Use" on Defendant Reya's website www.whoeasy.com,

6    which Reya fully admits to owning and operating, open as follows: "These WhoEasy

7    Terms of Service (the "Service Terms" or "Terms") and other policies incorporated

8    by reference in these Terms, including our Privacy Policy form a legally binding

9    agreement between R E Y A LLC ("WhoEasy", "we", "our" or "us"), who owns and

10   controls the website www.whoeasy.com (the "Website"), and you, the user of the

11   Services, as such term is defined below, ("you", "your", "yours" or "User"), and

12   describe the terms under which you agree to use the products and services on

13   www.whoeasy.com."

14   412.   Close inspection of this text reveals that "R E Y A" has been laid out

15   with a specific and unusual spacing between each letter. Upon information and

16   belief, Defendant Reya's affirmative choice of this formatting style would enhance

17   its ability to remain "under the radar" when search engines provided users with

18   results of searches for the properly formatted "REYA."

19   413.   Strikingly similar, the "Terms of Usage" on the infringing website

20   Spydialer.org open as follows: "These SafeCaller Terms of Service (the "Service

21   Terms" or "Terms") and other policies incorporated by reference in these Terms,

22   including our Privacy Policy form a legally binding agreement between R e y a LLC,

23   who owns and controls the website www.spydialer.org (collectively "SPY

24   DIALER", "we", "our" or "us"), and you ("you", "your", "yours" or "User"), and

25

describe the terms under which you agree to use the products and services on www.spydialer.org."

414.   Here, again, close inspection of this text reveals that "R e y a" has been laid out with a specific and unusual spacing between each letter. Upon information and belief, the entity or individual responsible for Defendant-website Spydialer.org affirmatively chose this formatting style in order to remain "under the radar" when search engines provide users with results of searches for the properly formatted "Reya."

415.   Of particular note, the identifier "R E Y A" – found in the "Terms of Use" of Defendant Reya's www.whoeasy.com website – has been edited to include lowercase letters on Spydialer.org, where it now reads as "R e y a." The entity or individual responsible for SpyDialer.org affirmatively edited this text but also chose to leave Defendant Reya's name intact. Two other identifiers in Spydialer.org's "Terms of Usage" – "SafeCaller" and "SPY DIALER" – are also edits of an identifier found in www.whoeasy.com's "Terms of Use" – "WhoEasy."

416.   The entity or individual responsible for identifying the website and domain name identified in Spydialer.org's "Terms of Usage" affirmatively edited this text from"WhoEasy" to reflect different identifiers, but still claimed Defendant Reya as the entity with responsibility for the website.

417.   Thus, the registrant(s) of domain-name Spydialer.org – believed to be Reya, or Defendants John Does, which plainly proclaims an affiliation with Defendant Reya – are liable to Plaintiff Spy Dialer for violation of the ACPA.

**Fifth Cause of Action**

**Defendants' Violations of California Comprehensive Computer Data**

**Access and Fraud Act, California Penal Code § 502**

418.  By this reference, Plaintiff Spy Dialer incorporates the preceding paragraphs, as if set forth fully herein.

419.  The statute cited herein was designed "to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal Pen Code § 502.

420.  Defendants repeatedly committed computer fraud under California state law on hundreds of thousands, if not millions, of discrete occasions, occurring over the course of the May 2017 through August 2017 time period in which Reya's intentional and fraudulent malicious banner advertisements were published on Plaintiff's spydialer.com website.

421.  Defendants intentionally used computers to create and distribute the malicious code that underlay the banner advertisements they caused to be published on Plaintiff's spydialer.com website.

422.  Defendants intentionally used the Advertising Platforms' computers and computer networks, without authorization, to cause the malicious banner advertisements to be transmitted to and published on Plaintiff's spydialer.com website.

423.  Defendants intentionally and knowingly exceeded any permissions it held to utilize the Advertising Platforms' computers and computer network when they did so in direct contravention of the Advertising Platforms' terms of service.

424.   Further, Defendants used a computer network to provide their whoeasy.com website to visitors that it unlawfully redirected from Plaintiff's spydialer.com website without their knowledge or assent.

425.   Defendants used Plaintiff's spydialer.com website without authorization when they used it to publish its intentional and fraudulent malicious banner advertisements and redirect unwitting visitors to Plaintiff's website to Defendant Reya's whoeasy.com website.

426.   Defendants knowingly exceeded any permissions they held to utilize Plaintiff's spydialer.com website when it caused the malicious banner advertisements to be published thereon.

427.   Defendants used the computers of visitors to Plaintiff's spydialer.com website, without authorization, to redirect them to Reya's whoeasy.com website.

428.   Defendants knew or reasonably should have known that it had no right to access the computers of visitors to Plaintiff's spydialer.com website, absent their own affirmative choices to engage with Defendant Reya's banner advertisements.

429.   Using said computers and computer networks, through its creation and distribution of the malicious banner advertisements, its maintenance of whoeasy.com, its abuse of Plaintiff's spydialer.com website and the Advertising Platforms, and its redirecting of Plaintiff's visitors to its own website, Defendants obtained valuable Internet traffic from Plaintiff Spy Dialer under the fraudulent guise of lawful advertising.

430.   Using said computers and computer networks, through its intentional creation and distribution of the malicious banner advertisements, its maintenance of whoeasy.com, its abuse of Plaintiff's spydialer.com website and the Advertising

Platforms, and its redirecting of Plaintiff's visitors to its own website, Defendants obtained monetary payments for its subscription services from visitors that it had unlawfully and fraudulently redirected from Plaintiff's spydialer.com website.

431. Thus, Defendants committed computer fraud, and violations of the California statute likely amounted to hundreds of thousands, if not millions, of discrete violations.

432. In violation of California Penal Code § 502(c)(l), Defendants knowingly accessed and without permission, altered or otherwise used Plaintiff's data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

433. Specifically, the Defendants' computer code knowingly altered a consumer's experience on the Spy Dialer website, by hijacking the user's cursor and stealing the focus of the display.

434. The code deceived users of the Spy Dialer website and defrauded the Plaintiff, who derived revenue from the users.

435. The Defendants' actions allowed them to obtain Internet traffic on Plaintiff's website, which had actively chosen Plaintiff's Internet properties, over Defendant's properties and Defendants obtained the value thereof.

436. In violation of California Penal Code § 502(c)(2), Defendants knowingly accessed and without permission, took, copied, or made use of any data from Plaintiff's computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

437.   Specifically, Defendants' intentionally created computer code made use of data from Plaintiff's computer, computer system, or computer network by interfering with Internet traffic that was browsing Plaintiff's website.

438.   In violation of California Penal Code § 502(c)(3), Defendants knowingly and without permission used or caused to be used Plaintiff's computer services.

439.   Specifically, Defendant's code relied upon being served to customers browsing the Spy Dialer website, and the code then impermissibly ran on Plaintiff's website, a computer service.

440.   In violation of California Penal Code § 502(c)(4), Defendants knowingly accessed and without permission altered, damaged, or destroyed Plaintiff's data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

441.   Specifically, Defendant's code altered the communications between users of the Spy Dialer website and the Spy Dialer computers. This action had the effect of altering and damaging the intended consumer experience on SpyDialer.com.

442.   In violation of California Penal Code § 502(c)(5), Defendants knowingly and without permission disrupted or caused the disruption of Plaintiff's computer services or denied or caused the denial of Plaintiff's computer services to an authorized user of a computer, computer system, or computer network.

443.   Specifically, the computer code disrupted the user experience between Spy Dialer website users and the Spy Dialer computer services by stealing the user's focus and "hijacking" the users' computer cursor.

444. In violation of California Penal Code § 502(c)(7), Defendants knowingly and without permission accessed or causes to be accessed Plaintiff's computer, computer system, or computer network.

445. Specifically, Defendants ran malicious code, which was not permissible on Plaintiff's website, or according to the third-party ad network's terms of service.

446. In violation of California Penal Code § 502(c)(8), Defendants knowingly introduced any computer contaminant into Plaintiff's computer, computer system, or computer network.

447. Specifically, Reya drafted, edited and otherwise created malicious code that was served on the Spy Dialer website. This code was a "computer contaminant" under the relevant statute.

448. Plaintiff suffered and continues to suffer damage because of Defendants' violations of the California Penal Code § 502 identified above.

449. Defendants' conduct also caused irreparable and incalculable harm and injuries to Plaintiff (including, but not limited to, Plaintiff's reputation and goodwill), and, unless enjoined, will cause further irreparable and incalculable injury, for which Plaintiff has no adequate remedy at law.

450. Defendants willfully violated California Penal Code § 502 in disregard of Plaintiff's rights, as well of the rights of Plaintiff's legitimate web site visitors.

451. Moreover, Defendants' actions as alleged above were carried out with oppression, fraud and malice.

452. Pursuant to California Penal Code § 502(e), Plaintiff is entitled to injunctive relief, compensatory damages, punitive or exemplary damages, attorneys' fees, costs and other equitable relief.

## **Sixth Cause of Action**

### **Common Law Trademark Infringement Against All Defendants**

453.   By this reference, Plaintiff Spy Dialer incorporates the preceding paragraphs, as if set forth fully herein.

454.   Defendants are liable to Plaintiff for infringement of Plaintiff's "Spy Dialer" trademarks subject to California common law.

455.   Plaintiff owns all common law rights in the "Spy Dialer" trademarks.

456.   Defendants have used the "Spy Dialer" trademarks in interstate commerce on the same classes of goods on which Plaintiff uses the marks and in the same channels of trade as those in which Plaintiff sells its products, without the knowledge of or authorization by Plaintiff, as alleged herein

457.   Upon information and belief, Defendants have acted with knowledge of Plaintiff's ownership of the marks and with the intent to unfairly benefit from the goodwill and prestige associated with Plaintiff's marks.

458.   Defendants' use of the marks are intended to and have caused confusion, mistake, and deception among consumers and the public as to origin, affiliation, or sponsorship.

459.   Upon information and belief, there has been actual confusion by customers and the public.

460.   Defendants' actions constitute trademark infringement in violation of the common law of the State of California.

## Seventh Cause of Action

### False Advertising Under California Business & Professions Code § 17500 Against All Defendants

461.   By this reference, Plaintiff Spy Dialer incorporates the preceding paragraphs, as if set forth fully herein.

462.   In order to induce consumers and the public to purchase their products and services, Defendants have made and disseminated, over the Internet, untrue and misleading statements and actions regarding those products and services.

463.   In particular, Defendants have intentionally registered an infringing domain name, spydialer.org, and Defendants have also intentionally undertaken to supply malicious code that fraudulently misdirected consumers from one supplier of goods, to another, competing supplier of goods.

464.   Defendants' actions and statements are made both before the public in California, and made or disseminated from California, and designed to harm Plaintiff, based in California.

465.   Defendants know, or have reason to know, that their actions were untrue and misleading.

466.   Therefore, Defendants have also engaged in unfair competition in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17500 et seq.

## **Eighth Cause of Action**

### **Violation of California Unfair Competition Law Under California Business & Professions Code § 17200 Against Both Defendants**

467.   By this reference, Plaintiff Spy Dialer incorporates the preceding paragraphs, as if set forth fully herein.

468.   Defendants have engaged in unlawful, unfair, and fraudulent business acts, deceptive, untrue, and misleading advertising.

469.   Plaintiff has suffered injury and lost money as a result of such unfair competition.

470.   Therefore, Defendants have also engaged in unfair competition in violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.

## **Ninth Cause of Action**

### **Common Law Conversion Against All Defendants**

471.   By this reference, Plaintiff Spy Dialer incorporates the preceding paragraphs, as if set forth fully herein

472.   In California, "Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages."[67]

473.   Plaintiff had a right to exercise control over its computer networks, its website, and all other computer resources.

---

[67] *Lee v. Hanley*, 61 Cal.4th 1225, 1240 (2015)

474.   Moreover, Plaintiff had the right to "possession" of the Internet traffic that had voluntarily accessed Plaintiff's website, which regularly results in revenue to the Plaintiff.

475.   Defendants converted the Plaintiff's rights in the traffic and its website to their own, temporary control, for their benefit, and to the detriment of the Plaintiff.

476.   Plaintiff incurred damages as a result, in the form of lower advertising revenue, damages to reputation, and damages to ongoing business operations.

## Tenth Cause of Action

## Common Law Fraud Against All Defendants

477.   By this reference, Plaintiff Spy Dialer incorporates the preceding paragraphs, as if set forth fully herein.

478.   The elements of fraud that will give rise to a tort action for deceit are: (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.[68]

479.   In this case, the Defendants misrepresented their relationship with Spy Dialer by way of the infringing domain name and the malicious advertisements, intentionally defrauding Plaintiff itself, as well as California consumers.

480.   Defendants knew that their actions were fraudulent and were intended to deceive Plaintiff and California consumers.

481.   Defendants intended to defraud Plaintiff, to harm Plaintiff's business, and California consumers, to derive income from such consumers.

---

[68] *Engalla v. Permanente Medical Group, Inc.*, 15 Cal.4th 951, 974 (1997)

Plaintiff incurred damages as a result, in the form of lower advertising revenue, damages to reputation, and damages to ongoing business operations.

## Eleventh Cause of Action

### In the Alternative, Negligence, Against All Defendants

482.   By this reference, Plaintiff Spy Dialer incorporates the preceding paragraphs, as it set forth fully herein.

483.   Even if Plaintiff does not demonstrate Defendant's liability as to other claims contained herein, Plaintiff alleges, in the alternative, that Defendants are liable for negligence.

484.   A cause of action for "negligence" requires: (1) a duty, or obligation, recognized by law; (2) a breach of the duty; (3) legal cause; and (4) actual loss or damage.[69]

485.   In the present matter, Defendants had a duty to exercise due care in drafting computer code, checking such code for errors, running their advertisements, registering domain names, drafting and displaying content on the Internet, and otherwise operating their business in a manner that did not trade on goodwill of other businesses and negatively affect or defraud consumers.

486.   The applicable standard of care is derived from, but is not limited to, common law, industry practice, and the terms and conditions of the third-party advertising platform.

487.   As explained in detail herein, Defendants breached their duties by intentionally drafting computer code designed to defraud third parties, intentionally running advertisements designed to defraud Plaintiff and consumers, and registering

---

[69] *Toland v. Sunland Hous. Grp., Inc.*, 18 Cal. 4th 253, 267, 74 Cal. Rptr. 2d 878, 887, 955 P.2d 504, 513 (1998).

domain names with an intent to deceive, or otherwise trade on the goodwill of the Plaintiff.

488.   Defendants' actions were the cause of the damages incurred by Plaintiff, because, but for Defendants' actions, as set out herein, none of the alleged conduct would have transpired.

489.   Mr. Smith admitted that he and Defendant Reya were fully or partially responsible for the creation of the malicious code and its ultimate placement on Plaintiff Spy Dialer's website. *See* Exhibit #9.

490.   Mr. Smith contended that the malicious code and its effects of "stealing focus," hijacking the cursors of Plaintiff Spy Dialer's customers, and redirecting said customers to whoeasy.com, were the result of a "coding error."

491.   Plaintiff suffered damages as a result of Defendants' negligence, as set out in detail, above.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiff seeks the following relief:

1.    Injunctive relief, precluding Defendants from future infringement of Plaintiff's intellectual property;

2.    Declare that Plaintiff has superior trademark rights in all of the stated marks that are superior to all of the Defendants named herein;

3.    Award attorney's fees to Plaintiff, pursuant to any applicable statute allowing or requiring such fees, or pursuant to common law;

4.    An award for damages, in an amount exceeding $5 million dollars, in an amount to be proven at trial, which may or may not include an election of any statutory damages that may be available to Plaintiff;

5.    Disgorgement or restitution by Defendants of all revenue earned from the fraudulent and unlawful practices described herein;

6.    An award of punitive damages, in an amount to be proven at trial;

7.    An award to Plaintiff of reasonable litigation expenses;

8.    An award to Plaintiff of pre-judgment and post-judgment interest, to the extent allowable; and

9.    Such further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff respectfully demands a trial by jury with respect to each claim in this Complaint.


Respectfully submitted,

/s/ Eric J. Menhart
Eric J. Menhart, Esq. *
* *Admitted Pro Hac Vice*

/s/ William Skinner
William Skinner, Esq.
*Attorney to be Noticed*

Attorneys for Plaintiff


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was filed via ECF and all parties of record were automatically notified via that system.

/s/ Eric J. Menhart
Eric J. Menhart, Esq.